In re ESTATE OF Frances WALKER;
Stanley M. Stefan, Appellant.

No. 01–PR–1098.

District of Columbia Court of Appeals.

Argued May 14, 2002.

Decided Jan. 12, 2006.

Thomas J. Gagliardo, Silver Spring, MD, for appellant.

Larry C. Williams for appellee.

Before SCHWELB and REID, Associate Judges, and WAGNER, Senior Judge.[1]

REID, Associate Judge:

This case concerns the proper distribution of the proceeds of a savings account held jointly in the names of the decedent, Frances Walker ("Ms.Walker"), who died intestate, and appellant Stanley Stefan ("Mr.Stefan"), who is unrelated to Ms. Walker. The trial court granted summary judgment in favor of Eulse Cee Young, Jr. ("Mr. Young"), the decedent's great nephew and personal representative of Ms.

---

1. Judge Wagner was Chief Judge at the time of argument. Her status changed to Senior Judge on December 19, 2005.

Walker's estate, who claimed the proceeds of the account as an asset of the estate. We reverse the trial court's ruling, and hold that on the facts of this case, summary judgment was not appropriate because the trier of fact must resolve genuine issues of material fact concerning the joint savings account. Therefore, we remand this case to the trial court for further proceedings consistent with this opinion.

## FACTUAL SUMMARY

The record before us, which includes Mr. Stefan's verified complaint, depositions of Mr. Stefan and Mr. Young, and the parties' cross-motions for summary judgment with supporting documents, shows that on or about July 16, 1998, Ms. Walker and Mr. Stefan established a joint savings account at the Industrial Bank. Prior to creating the account, Ms. Walker contacted Rovenia Daniels, then the assistant branch manager at the Industrial Bank, where Ms. Walker, a domiciliary of the District of Columbia, had maintained a number of accounts through the years, including one with her great nephew, Mr. Young. Ms. Walker informed Ms. Daniels that she wanted to remove Mr. Young's name from her account. Ms. Daniels advised that the account with Mr. Young would have to be closed and a new one opened because the bank "did not delete names from accounts." Ms. Walker indicated that she would visit the bank "as soon as she could get 'Stan' [Mr. Stefan]" to take her there.

When Ms. Walker and Mr. Stefan, her close friend,[2] went to the bank a few days later, Ms. Walker stated her desire to close her joint account with Mr. Young and to open one jointly with Mr. Stefan. Initially Ms. Walker wanted Ms. Daniels' name on the account, but Ms. Daniels explained that the addition of her name would be improper, since she was a bank employee. Ms. Daniels' affidavit declares that Ms. Walker instructed her to "add Stan's name because I don't want [Mr. Young] to have one red cent."[3] During his deposition, Mr. Stefan confirmed that Ms. Walker told Ms. Daniels, "I don't want [Mr. Young] to have one red cent."

Ms. Walker established the account as an "either or" account, meaning that either Ms. Walker or Mr. Stefan had the authority to withdraw funds from the account, without the consent of the other. In her affidavit Ms. Daniels states: "I explained to Ms. Walker that opening the account as she instructed meant that Mr. Stefan could withdraw all of the money any time he wanted to, even if it was only ten minutes after the [bank signature] cards were filed. She said that was alright with her." Ms. Daniels also stated: "Account No. 624 1336 was opened so that either Ms. Walker or

---

**2.** Mr. Stefan stated in his deposition that he had known Ms. Walker since 1973 or 1974, and had maintained continuing contact with her, even when she was not in the Washington, D.C. area.

**3.** Ms. Walker, whose husband was deceased, lived for about one year in Louisiana with her nephew. When Mr. Young's job assignment changed and he could no longer look after Ms. Walker, he apparently proposed a nursing home for her. Mr. Young stated in his deposition that his aunt "felt like in her heart that I had promised her, like my father had, that

she could live with me for the rest of her life. And I had reneged on that by having to change my job status ...." Because she did not wish to go into a nursing home, Ms. Walker returned to Washington, D.C. Mr. Stefan was the guarantor on her lease at the time of her death, and had shopped with her and assisted her with matters relating to banking. Mr. Young had not seen his aunt since around November 1998, when he accompanied her back to the District of Columbia after she declined to enter a nursing home in Louisiana.

Mr. Stefan could make withdrawals without the signature of the other person because they were both owners of the account and that is the way Ms. Walker wanted it to be."

Mr. Stefan made no withdrawals from the account during Ms. Walker's lifetime; nor did Ms. Walker. Mr. Young declared during his deposition that there was always "around $178,000, $184,000" in the account. He also testified that: "[I]f you look back over that account, you'll see that she never withdrew from that account from the day she opened it when my grandmother's name was on it, when my father's name was on it, and my name was on it." In addition, Mr. Young pointed out that Ms. Walker would cash her Social Security checks and keep "large amounts of cash on her," which she apparently used for her everyday needs, and as "emergency money." Mr. Stefan asserted that Ms. Walker "would accumulate Social Security checks. . . ." He would then take her to the bank at her request where "she would cash them, put some money in the account, and retain the rest of the cash for herself."

After Ms. Walker's death on September 23, 1999, Mr. Stefan withdrew $8,633.91 from the account on October 4, 1999, to pay her funeral expenses, leaving a balance of $174,431.47. Subsequently, on November 22, 1999, without Mr. Stefan's knowledge, Mr. Young's attorney transferred the remaining savings account funds to an estate account, including interest in the amount of $597.95, for a total of $175,029.42.[4]

On June 20, 2000, Mr. Stefan filed suit against Ms. Walker's estate seeking the proceeds of the joint savings account, and alleging that "[i]t was [d]ecedent's expressed intent that the account would be for the benefit of Plaintiff upon her death." The parties later filed cross-motions for summary judgment.

On July 18, 2001, the trial court granted Mr. Young's summary judgment motion. The trial judge concluded that Mr. Stefan failed to prove by clear and convincing evidence "that the proceeds in the account were an inter vivos gift from the decedent." The court declared, in part:

This record does not contain unambiguous proof of donative intent and contains no unambiguous proof of delivery of these funds to the plaintiff during the decedent's lifetime.

. . . [I]t is obvious that the decedent . . . was merely taking steps to shield her assets from [Mr. Young]. She was a layperson and she was elderly. She did not realize that adding the name of [Mr.] Stefan to the account had no real connection to preventing access to her account by [Mr. Young]. She did not understand that her nephew simply could not access her funds if his name was not on the account. If this was her objective, she only needed to remove her nephew's name in order to accomplish her goal. Alternatively, she only might have wanted to send her nephew a demonstrative message, since she continued to use the account [as] she had done previously. In either event, her change in the titling of the account was only an act of personal convenience.

**4.** Around November 1999, Mr. Young attempted to obtain $53,000 from the joint savings account funds by writing a bank check to himself "for family purposes," that is, for distribution to himself, his sister and his half brother. He maintained during his deposition that Ms. Walker told him, "this is a family account. This money stays within the family." The bank stopped payment on the check, apparently because the account had been frozen by court order.

## ANALYSIS

Mr. Stefan contends that the trial court drew erroneous conclusions concerning the elements of a valid inter vivos gift: delivery, donative intent, and absolute disposition. Mr. Young argues that "Mr. Stefan has failed to provide sufficient proof as to every essential element of gift in order for him to prevail." [5]

Our standard of review of a summary judgment motion, which is *de novo*, *see Wallace v. Skadden, Arps, Slate, Meagher & Flom LLP,* 799 A.2d 381, 385 (D.C.2002), is a familiar one: "[T]he movant [ ] must demonstrate that there is no genuine issue of material fact, and that [the movant] is entitled to judgment as a matter of law." *Isaac v. First Nat'l Bank of Maryland, D.C.,* 647 A.2d 1159, 1160 (D.C.1994); *see also Colbert v. Georgetown Univ.,* 641 A.2d 469, 472 (D.C.1994) (en banc). Super. Ct. Civ. R. 56(c) governing summary judgment motions specifies that: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Furthermore, "since the moving party carries the burden of proving no genuine issue of fact in dispute, 'the material lodged in support of the motion must be viewed in the light most favorable to the opposing party.'" *Nader v. Toledano,* 408 A.2d 31, 42 (D.C.1979) (citations omitted). "If the offered evidence and its inferences would *permit* the factfinder to hold for the nonmoving party under the appropriate burden of proof, the motion for summary judgment should be denied." *Id.* (emphasis in original).

In addition, "[i]f 'the case turns on controverted facts and the credibility of witnesses, the case is properly for the jury.'" *National R.R. Passenger Corp. v. McDavitt,* 804 A.2d 275, 280 (D.C.2002) (citing *Corley v. BP Oil Corp.,* 402 A.2d 1258, 1263 (D.C.1979)) (quoting *Aylor v. Intercounty Constr. Corp.,* 127 U.S.App. D.C. 151, 155, 381 F.2d 930, 934 (1967)); *see also Uckele v. Jewett,* 642 A.2d 119, 124 (D.C.1994) ("resolution of witnesses'

---

**5.** Subsequent to the establishment of the joint account between Ms. Walker and Mr. Stefan, and after Ms. Walker's death, the Council of the District of Columbia enacted legislation incorporating the Uniform Nonprobate Transfers on Death Act. Effective April 27, 2001, the Act became D.C. Law 13–292, D.C.Code § 19–602.01 *et seq.* (Supp.2004). Section 19–602.11(b) of that Act provides that: "During the lifetime of all parties, an account belongs to the parties in proportion to the net contribution of each to the sums on deposit, unless there is clear and convincing evidence of a different intent ...." However, § 19–602.12(a) specifies that: "Except as otherwise provided in this subchapter, on death of a party sums on deposit in a multiple-party account belong to the surviving party or parties ...." The legislative history of § 19–602.11 states in part: "The assumption that no present change of beneficial ownership is intended may be disproved by showing that a

gift was intended." COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON THE JUDICIARY, Report on Bill 13–298, The "Omnibus Trusts and Estates Amendment Act of 2000," November 16, 2000, at 45. And, the legislative history relating to § 19–602.12(a) specifies: "The effect of subsection (a) is to make an account payable to one or more of two or more parties to a survivorship arrangement unless a nonsurvivorship arrangement is specified in the terms of the account." *Id.* at 46.

We discussed the impact of this new legislation extensively in *In re Estate of Blake,* 856 A.2d 1151 (D.C.2004), and remanded that case "for consideration of whether there is any reason why [the Uniform Nonprobate Transfers on Death Act should not be applied.]" *Id* at 1153. On remand in this case, the trial judge also should determine the retroactive impact, if any, of the Uniform Nonprobate Transfers on Death Act.

credibility is an issue left to a jury"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whe[n] he [or she] is ruling on a motion for summary judgment[.]"). "If the witness has an interest in the outcome of a case, and ... if evidence opposing [a] presumption is contradictory or reasonably subject to contradictory interpretations[,] *the question becomes one for the trier of the facts." Uckele, supra,* 642 A.2d at 124 (quoting *Davis, supra,* 492 A.2d at 887) (other citation omitted) (emphasis in original).

 Since the trial court granted Mr. Young's motion for summary judgment, we review the record in the light most favorable to Mr. Stefan. But, we are mindful both that Mr. Stefan has the burden of establishing an *inter vivos* gift from Ms. Walker to him by clear and convincing evidence, and that there is a presumption that the joint account was one of convenience. As we reiterated in *In re Estate of Delaney*, 819 A.2d 968 (D.C.2003):

> In the District of Columbia, "[w]here a party opens a joint account for [her] self and another without consideration, the account is presumed opened for the convenience of that party." *Davis v. Altmann*, 492 A.2d [884,] 885 [ (D.C. 1985) ]. *See also Murray v. Gadsden*, 91 U.S.App. D.C. 38, 44, 197 F.2d 194, 200 (1952), *Edstrom v. Kuder*, 351 A.2d

506, 509 n. 7 (D.C.1976). This convenience account presumption always applies where the funds were deposited by only one of the parties, even where the printed bank card signed by the parties recites a right of survivorship. *Imirie [v. Imirie ]*, 100 U.S.App. D.C. 371[, 372], 246 F.2d [652,] 653 [ (1957) ]. The presumption puts the person who is claiming that the account carried a right of survivorship in the position of claiming that the account funds were an *inter vivos* gift, and shifts the burden of proof to that person. *Harrington v. Emmerman*, 88 U.S.App. D.C. 23, 27, 186 F.2d 757, 761 (1950); *Duggan [v. Keto ]*, 554 A.2d [1126,] 1134 [ (D.C.1989) ]; *Davis v. Altmann, supra,* 492 A.2d at 885. When the claim of an *inter vivos* gift comes after the alleged donor has died, the gift must be proven by clear and convincing evidence. *Uckele v. Jewett,* 642 A.2d 119, 123 (D.C.1994); *Duggan, supra,* 554 A.2d at 1134; *Estate of Presgrave v. Stephens,* 529 A.2d 274, 280 (D.C.1987). *Id.* at 990.

 Mr. Stefan must establish by clear and convincing evidence that Ms. Walker made a valid *inter vivos* gift to him.[6] To do so, he must overcome the presumption that the joint bank account was created for Ms. Walker's convenience; and must also satisfy "the requisites of a valid gift inter vivos[:] delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift." *Presgrave, supra,* 529 A.2d at 280 (internal quotation marks and citation

---

6. "Clear and convincing evidence is most easily defined as the evidentiary standard that lies somewhere between a preponderance of evidence and evidence probative beyond a reasonable doubt." *In re K. A.*, 484 A.2d 992, 995 (D.C.1984) (citing *Addington v. Texas,* 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979)). It "is such evidence as would 'produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established.' " *Dawkins v. United States,* 535 A.2d 1383, 1384 (D.C.1988) (citing *District of Columbia v. Hudson,* 404 A.2d 175, 179 (D.C.1979) (quoting *In re Estate of Soeder,* 7 Ohio App.2d 271, 220 N.E.2d 547 (1966))); *see also In re Wells,* 815 A.2d 771, 783–84 (D.C.2003) (citations omitted).

omitted). "The presumption is merely a judicial inference as to probable intent...." *United States v. Taylor,* 276 U.S.App. D.C. 84, 87, 867 F.2d 700, 703 (1989). It "is rebuttable[,] ... [and] may be overcome by showing that [Ms. Walker] intended to give [Mr. Stefan] a present interest in the [joint savings account] at the time she established the [account]." *Richardson, supra,* 522 A.2d at 1298 (citing *Harrington, supra,* 88 U.S.App. D.C. at 27, 186 F.2d at 761). In rebutting the presumption and showing intent, Mr. Stefan may rely upon reasonable inferences, in light of the applicable evidentiary standard, that are drawn from depositions and other documents. *See Imirie, supra,* 100 U.S.App. D.C. at 372, 246 F.2d at 653; *see also Uckele, supra,* 642 A.2d at 124.

■■■ In determining whether Mr. Stefan satisfied the element of donative intent, the trial court viewed the issue in the light most favorable to Mr. Young, rather than the opposing party, Mr. Stefan. The court interpreted Ms. Walker's words, "add [Mr. Stefan's] name because I don't want [Mr. Young] to have one red cent," to mean that Ms. Walker wanted a "convenience account," an inference favorable to Mr. Young. As the court put it:

> If [Ms. Walker] was disgruntled with her nephew, her motive for titling this account as a joint account was quite obviously a matter of her expressing her personal pique. This is a personal convenience in a very classic sense.

The trial court then focused on Mr. Young's deposition testimony that his aunt believed he had "reneged" on a promise to let her "live with [him] for the rest of her life." And, the court inferred that:

> [Ms. Walker's] good customer service type of relationship with [Ms. Daniels] strongly suggests that she was seeking the added assistance of a bank official who could help to safeguard her funds

and who would be aware of her priority of eliminating the nephew's access to her funds. This, too, is a sign of acting for the sake of personal convenience.

Furthermore, the court drew inferences from Ms. Walker's status as a layperson and an elderly woman:

> [Ms. Walker] was a layperson and she was elderly. She did not realize that *adding* the name of [Mr.] Stefan to the account had no real connection to preventing access to her account by [Mr. Young]. She did not understand that her nephew simply could not access her funds if his name was not on the account. If this was her objective, she only needed to remove her nephew's name in order to accomplish her goal. Alternatively, she only might have wanted to send her nephew a demonstrative message, since she continued to use the account [as] she had done previously. In either event, her change in the titling of the account was only an act of personal convenience.

(Emphasis in original). Yet, nothing in the record on appeal indicates any lack of understanding on Ms. Walker's part due to her lay status or her age.

By focusing upon Mr. Young's statements about his aunt and drawing inferences concerning Ms. Walker's intent that were unfavorable to Mr. Stefan, the court did not view the summary judgment documents " 'in the light most favorable to the opposing party.' " *Nader, supra,* 408 A.2d at 42. But, aspects of those documents could be read to infer that Ms. Walker intended to make a present gift to Mr. Stefan. While making inferences favorable to Mr. Young, even though he had not seen his aunt since returning her to the District from Louisiana around November 1998, the trial court ignored Mr. Stefan's twenty-five year friendship with Ms. Walker and the non-monetary assistance he

gave her. In addition, the trial court discounted favorable inferences that could be made regarding Ms. Walker's decision to add Mr. Stefan's name to her savings account and to remove that of Mr. Young. When Ms. Daniels advised Ms. Walker that if she entered into a joint savings account with Mr. Stefan, he "could withdraw all of the money any time he wanted to, even if [it] was only ten minutes after the cards were filed," Ms. Walker replied that "that was alright with her." In addition, the depositions of both Mr. Young and Mr. Stefan revealed that Ms. Walker had not withdrawn any money from the account since the funds were first placed there. As Mr. Young stated: "If you look back over that account, you'll see she never withdrew from that account from the day she opened it when my grandmother's name was on it, when my father's name was on it, and my name was on it." Mr. Stefan confirmed that from the time his name was placed on the account, Ms. Walker made no withdrawals. Given this information, and in light of the fact that the account was a savings account and not a checking account, a reasonable inference could be made that it was not a convenience account, even though Ms. Walker made some deposits when she cashed her accumulated Social Security checks.[7] This inference is strengthened by the fact that Ms. Walker never asked Mr. Stefan to deposit any of her Social Security checks in the account but, instead, asked Mr. Stefan to take her to the bank where she personally cashed the checks, deposited some funds from them into the joint savings account and retained the rest of the cash for herself.

On this record inferences could be drawn to conclude, either that Ms. Walker intended to make a present gift of the savings account to Mr. Stefan, or as the trial court declared, that she intended merely to establish the account for her convenience. Both Mr. Young and Mr. Stefan obviously were interested in the disposition of the joint bank account funds. Mr. Young testified that the joint bank account contained "family" funds and that Ms. Walker intended for them to be distributed to family. Mr. Stefan asserted that Ms. Walker made a gift of the funds to him when she closed out the account with Mr. Young and opened an account with his [Mr. Stefan's] name knowing that he could withdraw all of the funds at any time. "If the witness has an interest in the outcome of a case, and ... if evidence opposing [a] presumption is contradictory or reasonably subject to contradictory interpretations[,] *the question becomes one for the trier of the facts.*" *Uckele, supra,* 642 A.2d at 124 (quoting *Davis, supra,* 492 A.2d at 887) (other citation omitted) (emphasis in original). Moreover, this matter also involves the credibility of the witnesses, and resolution of credibility issues is within the province of the trier of the facts. *See Kuder v. National Bank,* 497 A.2d 1105, 1107 (D.C.1985) (" '[T]he mere fact that the witness is interested in the result of the suit is deemed sufficient to require the credibility of his testimony to

---

7. One court has explained a convenience account as follows:

A "convenience account" is an account apparently held in some form of joint tenancy, where in fact the creator did not intend the other tenant to have any interest, present or future, but had some other intent in creating the account. An example of a convenience account is an account where the creator only wanted the other tenant to write checks at the creator's direction, and not to have any share in the account during the creator's life or on the creator's death. *In re Estate of Hazel Teall,* 329 Ill.App.3d 83, 263 Ill.Dec. 364, 768 N.E.2d 124, 129 (2002) (citing *In re Estate of Harms,* 236 Ill.App.3d 630, 177 Ill.Dec. 256, 603 N.E.2d 37 (1992)).

be submitted to the jury as a question of fact.' ") (quoting *Sartor v. Arkansas Natural Gas Corp.*, 321 U.S. 620, 628, 64 S.Ct. 724, 88 L.Ed. 967 (1944)). In short, a genuine issue of material fact exists here, as well as credibility issues, and hence, summary judgment was not appropriate. *Isaac, supra*, 647 A.2d at 1160; *McDavitt, supra*, 804 A.2d at 280; *see also Mitchell v. Mitchell*, 756 A.2d 179, 183 (R.I.2000) ("Where conflicting evidence of donative intent exists, the trier of fact—not the motion [judge]—should resolve the contested issue.") (citation omitted); *Blanchette v. Blanchette*, 362 Mass. 518, 287 N.E.2d 459, 463 (1972) ("In cases of conflicting evidence we have required that the question of donative intent be submitted to the trier of fact.") (citation omitted).

"Delivery" and "absolute disposition of the subject gift" are elements of a valid *inter vivos* gift which must be examined in light of our decision in *Estate of Presgrave, supra*, as well as the context of this particular case. *Estate of Presgrave* concerned a claim by the personal representative of the estate of Katie W. Presgrave that the proceeds of two certificates of deposit and a checking account, all held jointly in the names of Ms. Presgrave and her nephew, Robert J. Stephens, properly belonged to the estate and did not constitute *inter vivos* gifts. Mr. Stephens had a "close" relationship with his aunt. *Id.* at 275. A show cause order was issued concerning "why [Mr. Stephens] should not disclose and turn over to [the personal representative] all assets he had which belonged to the estate." *Id.* After a show cause hearing during which Mr. Stephens testified and two witnesses corroborated his testimony, the trial court entered findings and

conclusions favorable to Mr. Stephens. We affirmed the trial court's disposition, concluding that the evidence presented by Mr. Stephens "clearly and convincingly supports the trial judge's finding that the decedent intended to create a present interest and right of survivorship in [Mr.] Stephens, and that [he] had met his burden to show that the accounts belonged to him rather than the estate." *Id.* at 280. Mr. "Stephens testified that his aunt intended the accounts to be jointly owned with a right of survivorship, and that she intended for him to be able to use the money during her lifetime, as well as to retain any remainder at her death." *Id.* His aunt indicated that "[Mr. Stephens] had the right to use this money during her lifetime, ... [but] he did not use any of the money because he thought he did not need it and his aunt did." *Id.*[8]

Implicitly, the majority in *Presgrave* recognized that the elements of "delivery" and "absolute disposition of the subject gift[s]" had to be considered within the context of that case. The same approach is appropriate here. "Delivery" may be actual or constructive with respect to a valid *inter vivos* gift. *See Duggan, supra*, 554 A.2d at 1135 (citation omitted). "The delivery required must be such as to vest the donee with control and dominion over the property, but this requirement must be tailored to suit the circumstances of the case." *In re Szabo*, 10 N.Y.2d 94, 217 N.Y.S.2d 593, 176 N.E.2d 395, 396 (1961). "To effectuate a constructive delivery, the delivery must be as perfect as the circumstances reasonably permit." *Kallop v. McAllister*, 678 A.2d 526, 531 (Del.1996) (citation omitted). Thus, "[i]f the donor has done all that normally could

---

8. The dissenting judge in *Estate of Presgrave* considered "[t]he question of intent ... [to be] a close one," but did not advocate reversal and judgment in favor of the estate. Rather, she maintained that the case should be "remand[ed] for a full trial on the merits to establish legal title to the assets." *Id.* at 284.

be done under the circumstances to put the intended donee in control of the personal property, there has been a delivery to that person." RESTATEMENT OF THE LAW OF PROPERTY (DONATIVE TRANSFERS) (SECOND), § 31.1, Comment (b), 1992 ed.

■ Here, Ms. Walker and Mr. Stefan executed signatory cards for the joint bank account. The account, as explained by Ms. Daniels in her affidavit, was an "either or" account, meaning that either Mr. Stefan or Ms. Walker could remove the funds, just as either Ms. Presgrave or Mr. Stephens could remove the subject funds in *Estate of Presgrave* during the donor's lifetime. Ms. Daniels advised Ms. Walker that adding Mr. Stefan's name to the account "meant that Mr. Stefan could withdraw all of the money any time he wanted to, even if it was only ten minutes after the [bank signature] cards were filed." Ms. Walker's response was that "that was alright with her," reasonably could indicate her intent to deliver the funds in the account to Mr. Stefan and to give him immediate dominion and control over all those funds. Ms. Walker's response reasonably could be interpreted as manifesting Ms. Walker's clear recognition that Mr. Stefan could withdraw and walk away with all of the funds from the account at any time, just as Mr. Stephens could in *Estate of Presgrave.* The fact that Ms. Walker also could withdraw the funds at any time does not indicate necessarily that the delivery requirement has not been satisfied. Indeed, this may be an even stronger case for delivery and dominion and control than was *Estate of Presgrave* where Ms. Presgrave apparently continued to use funds placed in the accounts. Mr. Young testified that Ms. Walker never withdrew funds from the joint savings account through the years, from the day it was first opened, when it bore her grandmother's name, and later, Mr. Young's father's name and Mr.

Young's name, in addition to her own. Thus, on the record in this case, Mr. Young was not entitled to judgment as a matter of law regarding the elements of "delivery" and "absolute disposition of the subject gift."

Accordingly, for the foregoing reasons, we remand this matter to the trial court for further proceedings consistent with this opinion.

*So ordered.*

SCHWELB, Associate Judge, concurring in part, dissenting in part, and concurring in part in the remand:

Stanley M. Stefan appeals from an order of the Probate Division of the Superior Court granting summary judgment in favor of the personal representative of the estate of the decedent, Frances Walker, with respect to Mr. Stefan's claim that he, and not the estate, was entitled to the proceeds of a savings account which was jointly owned by Mr. Stefan and the decedent at the time of the decedent's death. Mr. Stefan asserts that Mrs. Walker made an *inter vivos* gift to him of the money in the account. According to my colleagues in the majority, an impartial jury, upon viewing the record in the light most favorable to Mr. Stefan, could find by clear and convincing evidence that Mrs. Walker made an irrevocable *inter vivos* gift to Mr. Stefan. The majority so holds even though Mrs. Walker incontestably retained, until the day of her death, the power and right to withdraw the money from the account. I cannot agree that a trier of fact may fairly find a revocable act to be irrevocable. Accordingly, I respectfully dissent from the majority's holding that the question whether there was an *inter vivos* gift should have been submitted to the jury.

Although I disagree with much of the majority's discussion, however, I am constrained to concur in part in the remand

on the strength of the decision (issued more than two years after argument in this case) in *In re Estate of Blake,* 856 A.2d 1151 (D.C.2004), and the discussion in the court's opinion of the Uniform Nonprobate Transfers on Death Act, D.C.Code §§ 19–601.01 *et seq.* (Supp.2004). *Id.* at 1154–57. We noted in the *Estate of Blake* case that the relevant provisions of this statute apply retroactively to accounts established prior to its enactment. *Id.* at 1155. The parties have not been heard, however, with respect to the question whether the retroactivity principle applies even though Mrs. Walker died in 1999, well before the statute became effective in April 2001, or whether, on the contrary, any property rights vested at the time of Mrs. Walker's death and could not be affected retroactively. In any event, in light of *Estate of Blake,* and under the Uniform Act, Mrs. Walker's estate conceivably may not have been entitled to judgment in this case even if, as I attempt to demonstrate below, no impartial jury could reasonably have found that Mrs. Walker made an *inter vivos* gift to Mr. Stefan.

I agree with the majority, *ante* note 8, that the trial court should consider, in the first instance, whether the Act has any application in this situation. Accordingly, I join the remand to the extent that it requires the trial court to assess the effect, if any, of the Uniform Act on this appeal.

## I.

### ANALYSIS

A. *Standard of review.*

The question whether summary judgment was properly awarded to Mrs. Walk-

er's estate is one of law. *Abdullah v. Roach,* 668 A.2d 801, 804 (D.C.1995). Accordingly, we review the trial court's decision *de novo,* and owe it no deference. *Id.* I agree with the majority that the trial judge, in speculating regarding what Mrs. Walker may or may not have understood, failed to follow the established rule that on summary judgment, all reasonable inferences from the evidence must be drawn in the non-moving party's favor. This failure on the part of the trial judge was, however, irrelevant, for even without the questionable inferences, no impartial jury could reasonably find in Mr. Stefan's favor by clear and convincing evidence.

B. *The presumption applicable to joint accounts.*[9]

The legal principles governing this appeal, like the historical facts, are largely undisputed,[10] although the parties are at odds over their proper application to the present record. As this court explained in *Davis v. Altmann,* 492 A.2d 884, 885 (D.C. 1985),

[w]here a party opens a joint account for [her]self and another without consideration, the account is presumed opened for the convenience of that party. *Edstrom v. Kuder,* 351 A.2d 506, 509 n.7 (D.C.1976); *Murray v. Gadsden,* 91 U.S.App. D.C. [38,] 44, 197 F.2d [194], 200 [ (1952) ]. This presumption applies in all cases where the funds have been contributed by one of the parties even where the printed bank card signed by the parties recites a right of survivor-

---

9. In this part of the opinion, I am referring to the presumption in effect at the time of Mrs. Walker's death, and prior to the enactment of the Uniform Act.

10. I agree with the majority that *if* "the case turns on controverted facts and the credibility

of witnesses, the case is properly for the jury." In my opinion, however, there are no disputed material issues of fact, and Mr. Stefan is not entitled to judgment even if all of the evidence on his behalf is credited.

ship. *Imirie v. Imirie,* 100 U.S.App. D.C. 371, 372, 246 F.2d 652, 653 (1957). This presumption has the effect of shifting the burden of proof to the one claiming gift. *Harrington v. Emmerman,* 88 U.S.App. D.C. [23,] 27, 186 F.2d [757,] 761 [ (1950) ].

*Accord, In re Estate of Delaney,* 819 A.2d 968, 990 (D.C.2003). In this case, Mr. Stefan does not deny that all of the money in the joint account was placed there by Mrs. Walker. Accordingly, at least prior to the enactment of the Uniform Act, the presumption that the account was created for Mrs. Walker's convenience was fully applicable.

### C. *Inter vivos gifts.*

Mr. Stefan contends that in this case, the foregoing presumption has been rebutted by evidence that Mrs. Walker made him an *inter vivos* gift of the money in the joint account. The burden of proving that a transfer was an *inter vivos* gift is upon the party asserting the gift, and when the gift is asserted after the donor has died, it must be established by clear and convincing evidence.[11] *Davis, supra,* 492 A.2d at 885. The question before us is whether the trial judge correctly ruled, as a matter of law, that viewing the record in the light most favorable to Mr. Stefan, Mr. Stefan has failed to prove a gift by clear and convincing evidence.

The essential elements of an *inter vivos* gift are donative intent, delivery, and acceptance.... In order to prove donative intent, it must be shown from the evidence that the donor *clearly and unmistakably* intended to permanently relinquish all interest in and control over the gift.

*Ross v. Fierro,* 659 A.2d 234, 239 (D.C. 1995) (emphasis in original; citations and internal quotation marks omitted). "In order to have a valid *inter vivos* gift, the donor must have an intent to make a *present, absolute, and irrevocable* transfer of the property to the donee." 15 RICHARD R. POWELL & MICHAEL ALLAN WOLF, POWELL ON REAL PROPERTY § 85.21[1], at 85–409 (2000) (emphasis added).

Applying these principles to the creation of a joint bank account, the difficulty in proving the elements of an *inter vivos* gift become readily apparent. In *Murray v. Gadsden,* 91 U.S.App. D.C. 38, 197 F.2d 194 (1952), a joint account case, the court stated:

The requisites of a valid gift *inter vivos* are delivery, intention on the part of the donor to make a gift, *and absolute disposition of the subject of the gift. Harrington v. Emmerman,* 1950, 88 U.S.App. D.C. 23, 186 F.2d 757; *Cashman v. Mason,* 8 Cir., 1948, 166 F.2d 693; *Lust v. Miller,* 1925, 55 App. D.C. 217, 4 F.2d 293. In *Lee v. Lee,* 1925, 55 App.D.C. 344, 5 F.2d 767, we held an unqualified declaration of gift to be ineffective because the agreement by which the subject of the gift (a trunk with valuable contents) was deposited with the trust company *permitted withdrawal either by the donor or the donees. This retention of dominance by the donor was held to defeat the gift.*

91 U.S.App. D.C. at 49, 197 F.2d at 205 (emphasis added).

---

11. "Clear and convincing evidence" requires "a degree of persuasion much higher than 'mere preponderance of the evidence,' but still somewhat less than 'beyond a reasonable doubt.'" *District of Columbia v. Hudson,* 404 A.2d 175, 179 (D.C.1979) (citations omitted).

It must "produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *In re Estate of Soeder,* 7 Ohio App.2d 271, 220 N.E.2d 547, 574 (1966).

In *O'Hair v. O'Hair*, 109 Ariz. 236, 508 P.2d 66, 69 (1973) (en banc), the court persuasively explained why a gift in this context is so difficult to prove:

A bank account opened or carried in the name of two or more persons is in their joint custody. Joint custody of an account is a fact which, in itself, negatives any idea of a gift, *In re Betts' Estate*, 122 N.Y.S.2d 234, 235–36 (Surr.Ct.1953), since the essential element of a gift of personal property requires an intent on the part of the donor *to divest himself of all dominion and control* . . . .

The essential elements of a gift *inter vivos* are that the donor manifest a clear intent to give to the party claiming as donee, and give to the latter before death, full possession and control of the property. *Goff v. Guyton*, 86 Ariz. 349, 346 P.2d 286 (1959). There must be a donative intent, delivery, and a vesting of irrevocable title upon such delivery. *Armer v. Armer*, 105 Ariz. 284, 463 P.2d 818 (1970).

(Emphasis added.) *Accord, In re Kelly's Estate*, 285 N.Y. 139, 33 N.E.2d 62, 67 (1941) ("joint custody negatives any idea of a gift").

In *Quesenberry v. Funk*, 203 Va. 619, 125 S.E.2d 869, 873 (1962), the decedent's daughter claimed that the decedent's creation of a joint account, which had been in the name of the decedent and the daughter, constituted an *inter vivos* gift, but the court sustained a finding to the contrary:

The essential elements of a gift *inter vivos* are: (1) The gift must be of personal property; (2) possession of the property must be delivered at the time of the gift to the donee, or someone for him, and the gift be accepted by the donee; (3) the title to the property must vest in the donee at the time of the gift;

and *the donor must be divested of and the donee invested with the right of property in the subject of the gift; it must be absolute, irrevocable and without any reference to its taking effect at some future period.*

(Emphasis added; citations omitted.)

In *In re Mulqueeny's Succession*, 156 So.2d 317, 321–22 (La.Ct.App.), *cert. denied*, 157 So.2d 234 (La.1963), another joint account case, the court stated:

Since decedent opened the homestead accounts payable to him or the Executrix, he did not divest himself of title thereto in favor of the Executrix, but continued his dominion and control over them with the power of withdrawal, in whole or in part, without her knowledge or consent. *The deceased often expressed his desire that she should have these accounts, but he never executed a valid inter vivos manual gift to her.*

(Emphasis added.)

In *Denigan v. Hibernia Sav. & Loan Soc'y*, 127 Cal. 137, 59 P. 389, 390 (1899), the court described as "untenable" the claim that the decedent, who had opened a joint account in her name and in her husband's name, thereby made a gift of the money to her husband:

There is no presumption in favor of a gift (citation omitted); and in the present case *the idea of a gift is inconsistent with the retention by the wife of the right in herself to withdraw the whole of the money from the bank.* A valid gift goes into immediate effect, and has no reference to the future. It divests the donor of his title, and requires a renunciation on his part of all claim and interest in the subject of the gift.

(Emphasis added.) [12]

The logic of these decisions and of the articulation of the elements of a gift, both

---

12. There is case law in some jurisdictions contrary to the authorities I have cited with

by courts in the District and by other courts, would suggest that the creation of a joint account might never constitute a gift. In the District, however, our cases simply *presume* that there is no gift, and this presumption permits a finding, in extreme cases, that a gift was intended and made. *See, e.g., Prather v. Hill,* 250 A.2d 690, 691–93 (D.C.1969) (finding of gift sustained where some of the money in the account was owed to the claimant by the decedent, and where the decedent "was heard by others to say that the money in the account belonged to her"). See also Part I D, *infra.*

### D. *Application of the law to the facts.*

With the foregoing legal principles in mind, I turn to Mr. Stefan's claim that he was the recipient of an *inter vivos* gift, or at least that there exists a genuine issue of material fact with respect to that issue precluding the entry of summary judgment against him. If, as Mr. Stefan asserts, Mrs. Walker made an *inter vivos* gift to him, then she must have done so on July 16, 1998, the date on which she opened the joint account in his name as well as her own.[13] Mr. Stefan asserts that all of the elements of a gift, including donative intent, were satisfied at that time, or at least that a jury finding to that effect would not be unreasonable. I cannot agree.

As previously noted, one who makes an *inter vivos* gift must make an *absolute* disposition, *Murray,* 91 U.S.App. D.C. at 49, 197 F.2d at 205, and must thus intend to relinquish all of her interest or control in, the subject matter of the gift. *O'Hair,* 508 P.2d at 69; *Quesenberry,* 125 S.E.2d at 873. The gift must be "irrevocable and without any reference to its taking effect at some future period." *Quesenberry,* 125 S.E.2d at 873. Indeed, there must be a vesting of irrevocable title upon delivery of the gift. *O'Hair,* 508 P.2d at 69. Moreover, Mrs. Walker's intent to relinquish her interest and control absolutely and irrevocably must be clear and unmistakable. *Ross,* 659 A.2d at 239. Mr. Stefan insists that he has satisfied these requirements because, as Ms. Daniels explained to Mrs. Walker, he (Stefan) was authorized to withdraw all of the money in the account ten minutes after the account was established.

But Mr. Stefan's principal argument is a two-edged sword. Just as Mr. Stefan could withdraw the money without Mrs. Walker's consent, so too could Mrs. Walker withdraw it without Mr. Stefan's consent. Mrs. Walker and Mr. Stefan thus had joint custody and control over the account. This is the very circumstance that was held to be incompatible with a gift in *In re Mulqueeny's Succession,* 156 So.2d at 321–22. As the New York Court of Appeals explained in *In re Kelly's Es-*

---

respect to the necessity and extent of the donor's relinquishment of interest and control over the subject matter of the gift. *See generally* Gary D. Spivey, J.D., Annotation: *Creation of Joint Savings Account or Savings Certificate as Gift to Survivor,* 43 A.L.R.3d 971 (1972 & Supp.2005). This is due in part to the fact that in some jurisdictions, though not in the District of Columbia prior to the enactment of the Uniform Act, the creation of a joint account is presumed to be a gift. *See, e.g., Murgic v. Granite City Trust & Sav. Bank,* 31 Ill.2d 587, 202 N.E.2d 470, 472 (1964). In any event, the decisions in this jurisdiction

require "absolute disposition of the subject of the gift," *see, e.g., Murray,* 91 U.S.App. D.C. at 49, 197 F.2d at 205, although the application of the principle may be somewhat uneven. See, *e.g.,* Part I D, *infra.* In any event, I find persuasive the reasoning of the decisions of courts of other jurisdictions which I have cited in this opinion.

**13.** My colleagues in the majority do not, and indeed cannot, dispute that if a gift was made, it was made on that date.

*tate,* 33 N.E.2d at 67, joint custody is incompatible with the idea of a gift. In this case, as in the *Denigan* case decided more than a century ago, "the idea of a gift is inconsistent with [Mrs. Walker's] retention ... of the right ... to withdraw the whole of the money from the bank." *Denigan,* 59 P. at 390. Indeed, if Mrs. Walker had suffered a catastrophic illness or other misfortune, there is nothing in the record to negate that she would have done exactly that. So far as the record reveals, Mrs. Walker's main purpose was to prevent the money in the account from going to Mr. Young, rather than assuring that it be given to Mr. Stefan.

In any event, there is simply no evidence from which an impartial trier of fact could fairly find, by clear and convincing evidence, that Mrs. Walker intended to, or did, permanently relinquish to Mr. Stefan all control over the purported subject matter of the gift. On the contrary, the transaction was incontestably revocable; Mrs. Walker could have withdrawn the money from the account immediately after she set it up. After the joint account came into existence, *i.e.,* after the purported gift was made, Mrs. Walker had exactly the same amount of control over the money in the account as Mr. Stefan did, and not one iota less.

Moreover, the existence of any donative intent on Mrs. Walker's part is belied by the events that preceded the establishment of the account. The reader will recall that Mrs. Walker's initial plan was to set up a joint account in *three* names—Mrs. Walker, Mr. Stefan, and Ms. Daniels, the assistant branch manager of the bank. If Ms. Daniels had not refused (in order to avoid a conflict of interest) to allow her name to be placed on the account, then she too would have had the authority to withdraw all of the funds immediately. But no reasonable trier of fact could find, by clear

and convincing evidence, or even by any lesser standard, that Mrs. Walker intended to make a gift of the money in the account to a representative of the bank. It is therefore readily apparent that Mrs. Walker did not consider the naming of a person as the co-owner of a joint account as being the equivalent of making an *inter vivos* gift to that person.

I conclude that the record, viewed in the light most favorable to Mr. Stefan, would not permit an impartial jury to find by clear and convincing evidence that Mr. Stefan had established Mrs. Walker's donative intent. Accordingly, I need not address the other elements of a gift.

### E. *The Estate of Presgrave decision.*

In *Estate of Presgrave v. Stephens,* 529 A.2d 274, 280 (D.C.1987), relied upon by the majority, a divided court, over a powerful dissent by Judge Mack, held that on the facts before the court, the trial judge's finding that the decedent's creation of an "either or" account in her name and in the name of her nephew, "subject to the order of either or the survivor," 529 A.2d at 275, constituted an *inter vivos* gift of an interest in the account and the creation of a right of survivorship, and that the nephew was entitled to the proceeds of the account upon the decedent's death. The court did not address the problem raised by the decedent's retention, after the creation of the account, of control over the money therein—control that was identical to the nephew's control—nor did it deal with the requirement that in order to be effective, a gift *inter vivos* must be absolute and irrevocable:

> Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.

*Webster v. Fall,* 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411 (1925); *see also District of Columbia v. Sierra Club,* 670 A.2d 354, 360 (D.C.1996).

Be that as it may, *Estate of Presgrave* is distinguishable from the present case in significant respects. First, there was testimony in *Estate of Presgrave,* credited by the trial judge, that the decedent wanted her nephew to use some of the money during her lifetime for his own personal use, "[a]nd after she passed away she wanted him to have that account." *Estate of Presgrave,* 529 A.2d at 280 (emphasis added). This testimony was consistent with the provision in the account that the funds contained therein were subject to the order, *inter alia,* of the survivor.[14] There was no such testimony in the present case. Second, unlike the decedent in *Estate of Presgrave,* Mrs. Walker made it absolutely clear that she did not equate the placing of a person's name on a joint account with a gift to that person. She did so by proposing that the assistant branch manager of the bank—*i.e.,* an individual whom the decedent plainly did not intend to be the recipient of a gift of approximately $180,000—be named a co-owner of the joint account. There was no comparable testimony in *Estate of Presgrave.* The *Presgrave* case is, for the reasons stated, distinguishable from the present one, and does not require reversal here.[15]

## II.

## CONCLUSION

For the foregoing reasons, I would conclude, as a matter of law, that under the law in force at the time of the creation of account and also at the time of her death, Mrs. Walker did not intend to make, nor did she make, an *inter vivos* gift to Mr. Stefan.[16] I concur in the remand, howev-

---

**14.** *But cf. Imirie v. Imirie,* 100 U.S.App. D.C. 371, 372, 246 F.2d 652, 653 (1957) (presumption that joint account was created for convenience of party that contributed the money to a joint account and received no consideration applies even where the printed bank card provides for a right of survivorship); *Davis,* 492 A.2d at 885 (same).

**15.** In a cogent separate opinion in *Estate of Presgrave,* Judge Mack wrote, in pertinent part, as follows:

In allowing the trial court to determine ownership of the accounts based on an incomplete presentation of witnesses and facts, the majority gives short shrift to the commendable policy reasons underlying our decision in *Davis v. Altmann, supra.* Joint accounts are extremely useful for the elderly or ill who, with the passage of time, become less mobile or less able to manage their own finances. Such accounts allow another person to deposit and withdraw money from the original depositor's account for the well being of the original depositor. The convenience of such accounts would be greatly diminished if the mere listing of a second name on the account was sufficient to vest unconditional ownership in the second person when the depositor is no longer able to speak to intent. It is for this reason that we held in *Davis v. Altmann,* that, where a party opens a joint account for himself (or herself) and another, the account is presumed open for the convenience of that party. The presumption of convenience operates to ensure that a caretaker can administer a depositor's finances without running a risk that a court of law will lightly construe the depositor as a donor with present intent to give the accounts to the caretaker.

*Estate of Presgrave,* 529 A.2d at 284 (Mack, J., dissenting).

**16.** According to Ms. Daniels' affidavit, Mrs. Walker stated that she did not want Mr. Young to receive "one red cent" from the account. She accomplished this goal by closing the account of which Mr. Young had been a co-owner. The issue before us, however, does not relate directly to Mr. Young, even though Mr. Young happens to be the personal representative of Mrs. Walker's intestate estate. Rather, the question that the court must decide is whether the record would permit an impartial trier of fact to find, by clear and convincing evidence, that Mrs. Walker made

er, solely to permit the trial court to determine, in the first instance, the applicability to this case of the Uniform Nonprobate Transfers on Death Act. *See Estate of Blake*, 856 A.2d at 1154–57.

an *inter vivos* gift to Mr. Stefan. For the reasons stated, I would answer that question in the negative.