NEW MEDIA STRATEGIES, INC.,
Appellant/Cross–Appellee

v.

PULPFREE, INC. d/b/a BuzzMetrics,
et al., Appellees/Cross–
Appellants.

Nos. 06–CV–1483, 06–CV–1541.

District of Columbia Court of Appeals.

Submitted Dec. 4, 2007.
Decided Jan. 31, 2008.

Jack L. Wuerker, with whom Donnie L. Kidd, Jr., Tysons Corner, VA, was on the brief, for appellant/cross-appellee.

Geoffrey J. Greeves, with whom Ronald W. Kleinman, Washington, DC, was on the brief, for appellees/cross-appellants.

Before WASHINGTON, Chief Judge, THOMPSON, Associate Judge, and FERREN, Senior Judge.

THOMPSON, Associate Judge:

Appellant New Media Strategies ("NMS") seeks reversal of a grant of summary judgment that the trial court entered in favor of appellees, Pulpfree, Inc. and three of its officers (together, "Pulpfree"), on the ground that NMS's complaint alleging misappropriation of trade secrets was time-barred. Pulpfree has cross-appealed, contending that it was entitled to summary judgment on an alternative basis, as well as on statute-of-limitations grounds. We reverse that portion of the trial court's order granting summary judgment on statute-of-limitations grounds, affirm the court's decision declining to grant summary judgment on the alternative ground that Pulpfree urges, and remand for further proceedings.

## I.

The pertinent undisputed facts are as follows. In the summer of 2000, Pulpfree sold software that enabled users to "download text content published on the internet by third parties" or, stated differently, to "harvest" information that was available on the internet. By contrast, NMS's business included providing "analytical reports generated from data collected on the Internet" and market analysis of "online customer feedback." During mid-summer, representatives of Pulpfree and NMS commenced discussions and negotiations about NMS's potential acquisition of Pulpfree's software. The parties' negotiations involved the exchange of business information. Among other things, NMS provided Pulpfree a summary of its business plan. By the end of August 2000, the negotiations had terminated without a deal. Thereafter, however, Jonathan Carson of Pulpfree reinitiated contact with NMS outside director Oron Strauss. During November and December 2000 and January 2001, Carson exchanged several emails with Strauss and also met with him once, discussing Pulpfree's business opportunities and Pulpfree as a potential investment opportunity.

There, the parties' accounts diverge. Strauss asserts, in his affidavit in support of NMS's opposition to Pulpfree's motion for summary judgment, that, throughout his communications with Carson, he (Strauss) believed that Pulpfree "[was] continuing to develop [its] harvesting software and [was] looking for business opportunities to promote or license [its] product." Strauss avows that he believed that Pulpfree was "following substantially the same business strategy that [it] had been

following during the acquisition discussions," *i.e.,* attempting to sell its harvesting software, not "expand[ing its business] to include analytic or marketing services" similar to those provided by NMS. Pulpfree, by contrast, asserts that by the end of December 2000, Carson had disclosed to Strauss that Pulpfree was pursuing a new business model. Pulpfree asserts that Carson made this disclosure through email correspondence and during a meeting with Strauss, and by emailing to Strauss a copy of the Executive Summary of "BuzzMetrics," the trade name under which Pulpfree was pursuing its new business.

There is no dispute that Pulpfree has expanded its business. NMS argues that Pulpfree did so in a way that "mirror[s] New Media Strategies' online intelligence business as revealed in confidence to Pulpfree." NMS asserts, without contradiction, that Pulpfree's current website states, *inter alia,* that "BuzzMetrics analysts" use the company's software to deliver "quantitative analysis of marketplace perception and attitudes" and "actionable market findings and strategic recommendations," and to "identif[y] key market issues, challenges and opportunities."

NMS claims that it was not until early 2003 that Pulpfree's change of its business plan "to conform to the New Media Strategies business plan" came to NMS's attention. According to NMS, this occurred in late January 2003, when NMS's President, Pete Snyder, read an article regarding Pulpfree and alerted Strauss, who subsequently read the article, reviewed Pulpfree's BuzzMetrics website, and noticed that "the [website's] description of Pulpfree's business included language that was identical or similar to the language that

[NMS] had used for its branding and in the description of its business that it had provided to [Pulpfree] in 2000." [1] According to Strauss, when he thereafter telephoned Carson, Carson confirmed that "[b]ecause of the complexities and issues of selling and integrating [its] software, [Pulpfree] had decided that the software business alone did not make sense and ... sometime later in calendar year 2001 ... moved into providing analytic services including research, monitoring and marketing." Strauss relayed that message to Snyder, and on May 4, 2005, NMS filed a complaint against Pulpfree and its officers for misappropriation of trade secrets pursuant to the Uniform Trade Secrets Act ("UTSA"), seeking injunctive relief, including an order "[e]njoining Pulpfree and the individual defendants from all activities in competition with [NMS]," and compensatory damages. *See* D.C.Code § 36–401–11 (2001).

Pulpfree immediately moved for summary judgment, arguing that the UTSA's statute of limitations precluded NMS's claim. *See* D.C.Code § 36–406 (stating that "[a]n action for misappropriation must be brought within 3 years after the misappropriation is discovered or, by the exercise of reasonable diligence, should have been discovered"). Specifically, Pulpfree asserted that Carson's communications with Strauss in 2000 and 2001 placed NMS on notice of the alleged misappropriation. Pulpfree also argued that it was entitled to summary judgment on the ground that NMS consented to Pulpfree's use of NMS's alleged trade secrets and that NMS failed to protect the confidentiality of the alleged "secrets," making a UTSA claim unavailable.

---

**1.** By contrast, Carson asserts, in his affidavit in support of Pulpfree's motion for summary judgment, that Strauss told him during a telephone call in late 2002 that Strauss had read a Wall Street Journal Online article about BuzzMetrics and that Mr. Snyder "would be bothered by the article."

Ruling on Pulpfree's motion for summary judgment in an order dated October 12, 2006, the trial court stated that it "[was] not persuaded by NMS' position" that "there was no suggestion [to anyone at NMS prior to 2003] that Pulpfree was expanding its business to include marketing and analysis services similar to those provided by NMS." The court concluded that NMS either knew or should have known in the fall of 2000 that Pulpfree was "operating as a direct competitor of NMS." *Id.* at 4. The court therefore held that NMS's complaint was "barred by the expiration of the statute of limitation due to its accrual in the fall of 2000." *Id.* at 5. The court declined to rule on Pulpfree's argument that NMS consented to use of its trade secrets, although stating that the argument had "substance." *Id.* Finally, as to Pulpfree's argument that NMS had waived any claim under the UTSA by failing to protect the confidentiality of its trade secrets, the court held that the parties' contentions "present[ed] a factual dispute that a jury would have to decide but for the court's ruling on the statute of limitations defense." *Id.* at 6.

NMS noted this timely appeal. Pulpfree filed a timely cross-appeal, pursuing its contention that the trial court should have awarded summary judgment on the alternative ground that NMS consented to Pulpfree's use of NMS's claimed trade secrets.

## II.

In considering a motion for summary judgment, the trial court must view the facts in the light most favorable to the non-moving party. *Smith v. Washington Metro. Area Transit Auth.*, 631 A.2d 387, 390 (D.C.1993) (quotation marks and citation omitted). Summary judgment is appropriate only when the record, including "pleadings ... together with affidavits," indicates that "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Super. Ct. Civ. R. 56(c); *White v. Sargent*, 875 A.2d 658, 662–63 (D.C.2005). "Any doubt as to whether or not an issue of fact has been raised is sufficient to preclude a grant of summary judgment." *Copeland v. Cohen*, 905 A.2d 144, 146 (D.C. 2006) (citation and quotation marks omitted). "We review the trial court's grant of summary judgment de novo, making our own independent inquiry to determine whether the trial court correctly concluded that the movant was entitled to judgment." *Id.* Summary judgment is not appropriate if material evidence is "reasonably subject to contradictory interpretations." *In re Estate of Walker*, 890 A.2d 216, 222 (D.C. 2006) (citation omitted).

## III.

The trial court concluded that there was no genuine dispute that Mr. Strauss "was informed in the fall of 2000, of Pulpfree's intentions to provide products and services similar to those offered by NMS." The court reasoned that NMS's "knowledge of the existence of Pulpfree's new website, coupled with the knowledge gained by Strauss, through his discussions with Carson, reveals that NMS either knew, or at least should have known through reasonable efforts, that Pulpfree was operating as a direct competitor with NMS, in the fall of 2000." *Id.* at 4. Accordingly, the court found, there was "no issue of material fact exists regarding the statute of limitations defense." *Id.* at 4–5.

Our task on appeal is hampered by the court's (and the parties') somewhat vague and seemingly inconsistent descriptions of the purported trade secret that is the subject of NMS's claim of misappropriation. At one point, in discussing NMS's claim that Pulpfree expanded its business to

"products and services similar to those offered by NMS," the court characterized those services as involving "analyzing data and preparing reports." Order at 3. As already noted, the court also focused on whether NMS had reason to know that "Pulpfree was operating as a direct competitor with NMS."[2] *Id.* at 4. But at another point, the court emphasized that Carson had disclosed to Strauss that Pulpfree intended to "build [ ] applications" that would let client companies "run sophisticated quantitative analytics which will allow them to track and analyze what is being said about them online," *id.*— implying that the relevant disclosure by Pulpfree was that the company, in refining and promoting its software, was taking advantage of the concept or method of (clients') using information pulled from the internet for certain market research purposes.[3] As a result, we are not entirely certain whether the claimed trade secret relates to the business method of performing market analysis and preparing reports for certain types of clients using certain types of consumer-generated content harvested from the internet; or whether the claimed trade secret is broader than that, perhaps entailing the (mere) concept that consumer opinions harvested from the internet can be used to perform market analysis (such that BuzzMetrics' advertising of its harvesting software as useful for this purpose could be said to be an appropriation of NMS's trade secret).[4]

▪ If NMS's claim of misappropriation relates to Pulpfree's adoption of NMS's business model of performing analysis and preparing reports for client companies-which is what we are inclined to think the trial court understood to be NMS's claim-we cannot agree with the trial court's analysis that, beyond genuine dispute, NMS was on notice of the alleged misappropriation by the end of December 2000. The only entirely undisputed evidence about what was disclosed to Mr. Strauss during 2000 is the set of email communications between Strauss and Carson. The record also contains the BuzzMetrics Executive Summary, a version of which Carson emailed to Strauss on December 5, 2000 (which version, Carson asserts, was "substantially identical" to the version contained in the record). Reviewing these communications *de novo*, and construing any ambiguity in them in favor of NMS as the non-moving party, we conclude that they did not unambiguously disclose that the business of Pulpfree d/b/a BuzzMetrics entailed conducting marketing and analyt-

2. The court's description and focus seem to correspond to NMS's complaint about Pulpfree "expand[ing its business] to include analytic services" similar to those provided by NMS, and to NMS's prayer that Pulpfree be enjoined from activities in competition with NMS such as "real-time monitoring and analysis of public opinion."

3. Such an interpretation appears to be consistent with Pulpfree's defense that by December 2000, it had disclosed its intent to "harvest [ ] and organiz[e] consumer opinions from the internet as a form of opinion research/market research." The parties' differing descriptions of the conduct that allegedly constituted misappropriation strike us as the proverbial "ships that pass in the night."

4. The allegations in NMS's complaint arguably are consistent with either theory of misappropriation. Paragraph 35, for example, recites that NMS showed Pulpfree "how New Media Strategies implemented its business plan by showing them (a) the types of services provided, (b) who to contact within the hierarchy of a prospective client, (c) how New Media Strategies used the Internet to find needed information and to interact with the Internet in a manner that promoted the interests of New Media Strategies' clients and (d) how the clients were able to make use of the reports generated by New Media Strategies."

ical services of the type that NMS performed for its clients.[5]

The statements in the BuzzMetrics Executive Summary can reasonably be read to suggest no more than that Pulpfree intended to sell companies a software that would allow or enable those companies to perform market research and conduct their own analyses.[6] Nowhere does the Executive Summary state that BuzzMetrics would analyze for clients the online data that its software would permit the user to harvest. Pulpfree characterizes the Executive Summary as explaining that "Pulpfree was offering 'word of mouth' research services to its clients" through BuzzMetrics, and emphasizes that the Executive Summary refers both to BuzzMetrics' plan to sell "BuzzAnalyzer and *associated custom research*" and to BuzzMetrics' intent to "compete for clients' dollars" with "market research firms ..., online ratings firms ..., business intelligence consultants ..., and monitoring software firms (like eWatch and Webclippings)." Pulpfree argues that these references should have alerted Strauss that Pulpfree intended to compete with NMS, and that they put NMS on notice of its duty to investigate. We think the references are hardly as pellu-

cid as Pulpfree argues. As noted *supra,* in footnote 6, the Executive Summary repeatedly describes BuzzAnalyzer as a product that will allow *clients* to perform specialized analysis of online content, and *to generate reports*. Construing most favorably to NMS the Executive Summary's reference to "custom research," we think it might reasonably be read as denoting merely that BuzzMetrics' products would enable clients to gather and organize data in ways tailored to their individual needs. Construing most favorably to NMS the Executive Summary's reference to "compet[ing] for clients with market research" and other types of firms, we think it might reasonably be read as conveying BuzzMetrics' expectation that its products could replace rather than duplicate these firms' activities. Thus, in our view, the Executive Summary does not eliminate doubt about whether Strauss and NMS were given reason to know, more than three years prior to May 4, 2005, of Pulpfree's alleged misappropriation of NMS's business model of providing market research, analysis and reports for clients.[7]

We reach the same conclusion about the email correspondence between Carson and Strauss during late 2000. Carson's November 28, 2000 email to Strauss stated

---

**5.** We note, moreover, that Carson's affidavit nowhere states in a straightforward manner that he disclosed to Strauss that Pulpfree intended to expand its business to conduct analysis of online data for clients. Carson's affidavit states only, and vaguely, that the purpose of his meeting with Strauss in December 2000 was "to discuss our company's technology and our plans to apply it to market research via the internet."

**6.** The Executive Summary states that BuzzMetrics' technology "will be used *by companies to analyze* user-generated content" (emphasis added). It further states that Pulpfree's "software gathers and organizes user-generated content from thousands of sources into a single database, *allowing com-*

*panies to process and analyze* online community content in a meaningful way for the first time," and that with the software, *"companies will be able to analyze* online community content in a thorough and meaningful way for the first time" (emphasis added). The Executive Summary states in addition that BuzzMetrics' product will *"allow clients to perform highly specialized quantitative analysis* on online communities" and that with it, *"[c]lients will be able to ... generate* four basic types of reports" (emphasis added).

**7.** This is so even assuming that the Executive Summary that Carson sent to Strauss was identical to the version that is in the record—which itself is a matter of dispute.

that Pulpfree's business entailed "using [its] harvesting software ... to pull content from thousands of news sites, message boards, ecommerce sites (product reviews)"; "normaliz[ing] this data, tag[ging] it with [Pulpfree's] XML standard, and load[ing] it into a central database"; and "building applications *to let companies run* sophisticated quantitative analytics which will *allow them to track and analyze* what is being said about them online" (emphasis added). In that same email, Carson likened BuzzMetrics' "applications" to "high level analytic reports" (predicting that the applications would "solve the problem" of the "huge hole in the offerings of web clipping companies"). In light of Carson's reference a few lines earlier to Pulpfree's "building applications to let companies run sophisticated ... analytics," we think the analogy to "high level analytic reports" can reasonably be read to denote that the reports would be ones generated by client companies. Further, Carson's email conveyed Pulpfree's view that its "applications could be very useful to [NMS]" and Pulpfree's desire "to look into the possibility of a development partnership arrangement" with NMS[8]—comments that can reasonably be read to denote that Pulpfree was looking to assist or complement NMS's work, not to compete with NMS.

In sum, we see nothing in the text of the Executive Summary or the emails that we can say plainly should have alerted Strauss that Pulpfree intended to expand its business so as to provide-in the trial court's words—"marketing and analysis services similar to those provided by NMS, which involves analyzing data and preparing reports." Summary judgment was not appropriate, because the evidence is "reasonably subject to contradictory interpretations[, and] the question becomes one for the trier of the facts." *Estate of Walker*, 890 A.2d at 222 (citation omitted).

In granting summary judgment to Pulpfree, the trial court relied not only on the information conveyed to Strauss through the materials emailed by Carson, but also on Paragraph 41 of NMS's complaint. In that paragraph, NMS asserted that "by early October 2000, ... there was a new Pulpfree website which advertised services similar to those explained to [Pulpfree's officers] by [NMS]." The trial court construed the statement as indicating that NMS knew in 2000, "even before the communications between Carson and Strauss took place," of a new Pulpfree website—which, the court reasoned, NMS "could have checked at any time to learn that Pulpfree was offering products and services similar to those offered by NMS." In light of the rest of paragraph 41, we think the trial court read too much into NMS's statement (and, to the extent that the paragraph as a whole creates ambiguity, the court failed in its obligation to resolve the ambiguity in favor of NMS). The final sentence of paragraph 41 asserts that the fact that "Pulpfree had changed its business plan to conform to the [NMS] business plan came to the attention of [NMS] in early 2003." We read this statement as an assertion that NMS learned long after the fact that, in October 2000, Pulpfree had mounted its BuzzMetrics website, advertising analytic services.[9]

---

8. Carson's email to Strauss dated January 2001 was of the same tenor, stating that Pulpfree "would love to keep in touch with [Strauss and NMS] and continue to think about ways that we might be able to work together in the future."

9. Moreover, Strauss states that even if he had known in 2000 that Pulpfree d/b/a BuzzMetrics had a new website, he would have had no reason to investigate the website's content because he had no suspicion that Pulpfree might undertake to sell analytic services. Strauss asserts that "[n]othing indicated to

Pulpfree seems to argue (i) that because Carson's November and December 2000 emails alerted Strauss to Pulpfree's focus on applications of its harvesting software to pull consumer opinion content from the internet for market research purposes, NMS was put on constructive notice of Pulpfree's alleged misappropriation of at least a portion of NMS's business method; and (ii) that even if NMS's knowledge of Pulpfree's duplication of other aspects of NMS's business model (*e.g.*, preparation of analytic reports) came later, the limitations period began to run in 2000 "as to all claims for alleged misappropriation, even if no acts of misappropriation of the other secrets had yet occurred." *Intermedics, Inc. v. Ventritex, Inc.*, 822 F.Supp. 634, 636 (N.D.Cal.1993). Even if we were to accept the principle articulated in *Intermedics*—which we decline to do, at least at this juncture [10]—we could not uphold the grant of summary judgment unless it were established that one aspect of NMS's claimed trade secret is the use of consumer opinions harvested from the internet for market research purposes. As already discussed, that has not been established.[11] Should it be established, however, after remand and after discovery or other further proceedings, that the alleged trade secret pertains to the business method of pulling consumer opinion content from the internet for market research purposes (or something else short of NMS's model of preparing analytic reports based on internet data), Pulpfree would be free to renew its motion for summary judgment and the court could revisit the issue of whether NMS was on notice by the end of 2000 of Pulpfree's alleged misappropriation.[12]

me that Defendants were expanding their own business to include marketing and analysis services similar to those provided by [NMS] ... to the contrary, the emails, the executive summary and my conversations indicated that BuzzMetrics would be continuing its prior business model." At the very least, Strauss's statements, based on his personal participation in conversations with Carson, created a genuine issue of fact as to whether NMS knew or had reason to know of Pulpfree's new website advertising its expanded business more than three years before NMS filed its complaint. *See Weakley v. Burnham Corp.*, 871 A.2d 1167, 1177 (D.C.2005) (stating that an affidavit based on personal knowledge was sufficient to present a genuine issue of material fact that defeated summary judgment).

**10.** One reason is that the *Intermedics* court made clear that its holding was driven by the specific facts of the case before it. *Id.* The issue of first impression before the court was "when a cause of action accrues against a given defendant for misappropriation of some alleged trade secrets or confidential information, does the statute of limitations also begin to run from that time on possible claims against the same defendant for misappropriation of *other* alleged trade secrets or confiden-

tial information, without regard to whether there is [yet] evidence that the defendant has disclosed or used any of those other alleged secrets?" *Id.* (emphasis in the original). The court was careful "not [to] suggest that ... resolution [of the issue] would be the same in all factual settings." 822 F.Supp. at 636.

**11.** Indeed, although we do not decide the issue, the record makes us question whether the concept of using online consumer content for market research purposes could constitute a trade secret. The BuzzMetrics Summary suggests that the concept is already known: it boasts that "[t]he manager of a rapidly growing online marketing firm stated that her company *already attempts to produce the exact types of reports that they will be able to generate with Pulpfree's products,* but that they can only produce very simple, basic reports because they have to do the entire process manually" (emphasis added). *But see Mike's Train House, Inc. v. Lionel, L.L.C.,* 472 F.3d 398, 411 (6th Cir.2006) (citing authority for the proposition that a trade secret "can exist in a combination of characteristics each of which, by itself, is in the public domain" (citation omitted)).

**12.** Pulpfree's brief to this court also renews the argument, which Pulpfree made to the

## IV.

██ We need not analyze at length Pulpfree's argument, on cross-appeal, that it was entitled to summary judgment on the alternative ground that, through Strauss (in particular, Strauss's introduction of Carson to a potential investor), NMS endorsed Pulpfree's new business and thereby consented to Pulpfree's use of NMS's business model.[13] The trial court found that Strauss's knowledge that "Pulpfree was planning to engage in business directly aligned with NMS's business" and failure to object to that plan "g[ave] substance to Pulpfree's argument." However, for the same reasons that caused us to conclude that the record does not establish beyond genuine dispute that Pulpfree disclosed to Strauss by the end of 2000 that it was expanding its business in a way that involved appropriation of NMS's trade secrets, we reject, at least at this stage, Pulpfree's argument and the trial court's finding that NMS consented to Pulpfree's conduct.[14]

Accordingly, for the foregoing reasons, we reverse that portion of the trial court's order granting summary judgment to Pulpfree on the basis of the statute of limitations, affirm that portion of the order declining to grant summary judgment to Pulpfree on the basis of NMS's alleged consent, and remand for further proceedings consistent with this opinion.

*Affirmed in part, reversed in part, and remanded.*

---

trial court, that Pulpfree was entitled to summary judgment on the ground that NMS failed to protect the confidentiality of its business information, and therefore may not claim trade secret misappropriation under the UTSA. *See* D.C.Code § 36–401(4)(B) (defining "trade secret," in part, as information that is "the subject of reasonable efforts to maintain its secrecy"). As the trial court noted, NMS avowed, through Mr. Snyder, that it took reasonable steps to maintain the confidentiality of its business plan and that it posted a confidentiality statement on the cover of the business plan that it provided Pulpfree in the summer of 2000. We agree with the court that the parties' conflicting claims about NMS's efforts to protect its proprietary information "present a factual dispute that a jury would have to decide...." *See Estate of Walker,* 890 A.2d at 221 ("if the case turns on controverted facts and the credibility of witnesses, the case is properly for the jury," and summary judgment is inappropriate) (citation and quotation marks omitted).

13. *See* D.C.Code § 36–401(2)(B) (stating that "misappropriation" entails the "use of a trade secret of another without express or implied consent").

14. Strauss states that he introduced Pulpfree to the potential investor, Kraus, merely so that Kraus could "evaluat[e] and provid[e] feedback on [Pulpfree's] software," and that the introduction occurred at a time when Strauss believed that "Pulpfree was following substantially the same business strategy that [it] had been following during the acquisition discussions." Carson's affidavit does not contradict Strauss's explanation on this point: Carson states only that "[t]he purpose of the [introduction] was to explore whether Pulpfree's services could be of use to APCO's public relations clients. [Pulpfree] explained [its] software and its business use for online marketing purposes to Mr. Kraus and others present at the meeting...." We do not read Carson's reference to "business use" of Pulpfree's software for "online marketing purposes" necessarily to mean *Pulpfree's* use of the software for that purpose. Carson's statement is consistent with Strauss's explanation that he thought that Pulpfree planned to improve its harvesting software and to generate interest in the software among market analysis businesses that might have a use for the software. That explanation could also apply to Strauss's December 6, 2000 email to Kraus describing Pulpfree as a company of individuals who had "reinvented themselves with an interesting monitoring product they're building"; on its face, the statement does not necessarily denote that Pulpfree would be the one doing the monitoring with its product.