*In re* ESTATE OF HAZEL TEALL, Deceased (Estate of Hazel Teall, Deceased, Petitioner and Cross-Appellant and Respondent-Appellee, v. Anne Neitzel, Respondent and Cross-Appellee and Claimant-Appellant).

First District (2nd Division)   Nos. 1—00—3727, 1—00—3728 cons.

Opinion filed March 29, 2002.

Mark D. Molay, of Wiczer & Zelmar, L.L.C., of Northbrook, for appellant.

Michael J. Durkin, Theodore E. Harman, and Stacey C. Bromberg, all of Ungaretti & Harris, of Chicago, for appellee.

JUSTICE CAHILL delivered the opinion of the court:

Plaintiff, Anne Neitzel, filed a claim against the estate of Hazel Teall for personal services from 1986 until Teall's death in 1997. The administrator of Teall's estate brought a citation to recover assets against plaintiff to recover funds in joint bank accounts that passed to plaintiff at Teall's death. The trial court ruled that $136,000 from the joint bank accounts, as well as $25,000 in checks payable to cash written on the accounts by plaintiff, belonged to the estate. But the court then awarded plaintiff $231,920 on her claim for personal services. Both parties appealed.

Plaintiff argues on appeal that the trial court erred in admitting a letter written by Teall's physician and in finding that the joint bank accounts were convenience accounts. The administrator argues that a part of plaintiff's claim was barred by the statute of limitations and that the evidence is insufficient to support her claim.

Plaintiff moved into the house next door to Hazel Teall in 1959. Mrs. Teall lived with her husband, Charles, until his death in 1970. The Tealls had no children, and Mrs. Teall's only brother died in 1972.

In April 1986, Neitzel and Richard Jones, another neighbor, found Teall lying on the kitchen floor of Teall's house. She had fallen from a ladder days earlier. Neitzel called an ambulance and Teall was taken to the hospital. Neitzel saw that the house was infested by mice and ants. While Teall was in the hospital, Neitzel cleaned Teall's house. She hired a pest control company and had Teall's rotted blinds replaced. Neitzel also consulted an attorney who drafted a power of attorney. Teall signed the power of attorney, naming Neitzel as her agent. Teall signed the document in the presence of Neitzel, Jones and two other witnesses.

Teall spent a month in a nursing home before returning home. Neitzel then began to care for her. Neitzel helped with dressing and bathing Teall, cooking, cleaning, shopping, driving, yard work and other home chores. Neitzel also paid Teall's bills and deposited her

stock dividend checks. Neitzel did not keep track of her hours, but she was "on call" 24 hours a day.

John Hirn, a home health agency consultant, testified to the value of services provided by a caregiver without formal training. In 1986, she would have received $4.50 to $5 an hour; at the time of trial, she would receive $8 an hour. A caregiver would also earn an extra $100 a week for being on call, as well as "time and a half" for weekends. A companion caregiver to a nursing home resident would receive hourly pay that included time for travel to and from the nursing home, visiting and running errands. Hirn testified that the financial services Neitzel provided Teall were worth "far more than minimum wage."

Genevieve Mavigliano testified that she worked for Medical Personnel Pool and was hired by Neitzel in 1992 to provide companionship to Teall. Mavigliano worked five days a week, three hours a day during 1992 and 1993. She testified that Teall was "very good" mentally and was a "sharp cookie for her old age."

Neitzel testified that she and Teall never discussed payment for Neitzel's services. Neitzel testified, "I just took care of her like she was a family member without expecting payment." She thought "at some point in the future" she would be paid, but she never wrote herself a check from Teall's accounts as payment for her services and never wrote a check to cash for herself. Neitzel could not explain how several checks written to cash and endorsed by her were spent. Neitzel knew she would receive the proceeds from the joint accounts when Teall died, but did not see them as payment for her services. Richard Jones testified that Teall told him she benefitted from Neitzel's care and that Neitzel should be rewarded for her work.

In 1988, Neitzel petitioned the Illinois Department of Revenue to waive penalties assessed against Teall for Teall's failure to file timely tax returns. Neitzel requested a letter to support her tax petition from one of Teall's doctors, Dr. David Fishman. Dr. Fishman wrote a letter on June 6, 1988, stating that he treated Teall in 1986 and diagnosed her as having "syncope, dehydration and acute decompensation of organic brain syndrome."

Eric Matlin, an attorney, testified that Neitzel brought Teall to him in 1992 to discuss Teall's estate plan. Matlin did not prepare any documents for Teall because he "did not think she exhibited proper dispositive intent." Matlin testified that, when asked who she wanted to leave her money to, Teall gave the names of people who had already died.

Teall was admitted to a nursing home in April 1993. She was diagnosed with Alzheimer's disease. Nursing home records show that Teall was unable to make financial or health care decisions, had poor

memory and was often disoriented. Neitzel testified that she visited Teall almost every day, participated in health care decisions with nursing home staff, ran errands for her and took her on outings. Nursing home records show that Neitzel visited and took Teall shopping, to the beauty shop and out to dinner. She attended care plan conferences and family meetings. She also approved health care decisions by telephone.

The first joint bank account was opened by Neitzel while Teall was in the nursing home after her fall in May 1986. Teall signed signature cards for several other accounts while she was in the nursing home. Neitzel testified that Teall only went to the bank once or twice. Other joint accounts were created during the years Neitzel held power of attorney. All statements and other banking correspondence were sent to Neitzel's address. Neitzel testified that she never discussed with Teall whether the accounts were to include a right of survivorship and Teall never told Neitzel that she wanted her to have the money in the accounts.

■ Neitzel argues that the trial court erred in finding that the joint accounts were convenience accounts.

> "A 'convenience account' is an account, apparently held in some form of joint tenancy, where in fact the creator did not intend the other tenant to have any interest, present or future, but had some other intent in creating the account. An example of a convenience account is an account where the creator only wanted the other tenant to write checks at the creator's direction, and not to have any share in the account during the creator's life or on the creator's death." *In re Estate of Harms*, 236 Ill. App. 3d 630, 634, 603 N.E.2d 37 (1992).

■ A presumption of fraud attaches to a transfer by a fiduciary for his or her own use, and this presumption is only overcome by clear and convincing evidence. *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 464, 448 N.E.2d 872, 877-78 (1983). "At the creation of a statutory joint tenancy, a presumption of donative intent arises and a party claiming adversely to the instrument creating the joint account has the burden of proving by clear and convincing evidence that a gift was not intended." *Harms*, 236 Ill. App. 3d at 634, citing *Murgic v. Granite City Trust & Savings Bank*, 31 Ill. 2d 587, 589, 202 N.E.2d 470 (1964). In a case such as this one, where Neitzel, a fiduciary, made herself a joint tenant on Teall's accounts, the presumptions of fraud and donative intent conflict. The *Harms* court held that, where such conflicting presumptions exist, they cancel each other out, leaving the trial court free to make a determination based on the facts and the credibility of the witnesses. *Harms*, 236 Ill. App. 3d at 640, 603 N.E.2d at 44.

In *In re Estate of Copp*, 132 Ill. App. 2d 974, 980, 271 N.E.2d 1 (1971), the decedent directed her niece to obtain signature cards so decedent could convert her accounts to joint tenancy. The decedent made an oral statement to her niece in the presence of witnesses that she wanted the niece to have the money in the accounts. Before decedent's death, the niece paid decedent's bills from the joint account. The court held that, absent evidence of abuse or betrayal of confidence, a finding of a fiduciary relationship between joint tenants does not rebut the presumption of donative intent.

But in a later case, *In re Estate of Rybolt*, 258 Ill. App. 3d 886, 890, 631 N.E.2d 792, 795 (1994), the court limited *Harms* to apply only where the joint accounts were created before the fiduciary relationship began and where deposits made during the fiduciary relationship followed a procedure established before the relationship. "[W]here the attorney-in-fact actively uses his position to create the joint tenancies the presumptions do not cancel; instead, the controlling presumption is the presumption of fraud, which requires strong evidence to overcome." *In re Estate of DeJarnette*, 286 Ill. App. 3d 1082, 1089, 677 N.E.2d 1024 (1997), citing *Rybolt*, 258 Ill. App. 3d at 890. Factors in meeting the burden of proof to rebut the presumption of fraud are: (1) a showing that, before the transaction, the fiduciary made a frank disclosure of all relevant information; (2) the fiduciary paid adequate consideration for the transaction; and (3) the principal had competent and independent legal advice. See *Rizzo v. Rizzo*, 3 Ill. 2d 291, 304-05, 120 N.E.2d 546 (1954).

■ Here, Neitzel became Teall's fiduciary after she found Teall had fallen in her home. When Neitzel began caring for Teall, she discovered that for some time Teall had not paid bills, maintained her house or managed her affairs adequately. Neitzel did not become a joint tenant of Teall's accounts until after she became her fiduciary. Although Neitzel testified that Teall converted some of the accounts to joint tenancy in person at the bank, several times Neitzel brought signature cards to Teall in the hospital or nursing home to sign and return to the bank. Neitzel did not contribute her own money to the accounts. She deposited Teall's stock dividend checks into the accounts, as well as the proceeds from various certificates of deposit. Teall never told Neitzel that she wanted her to have the money in the joint accounts, nor did Teall receive independent advice about how to manage her accounts. In light of this evidence, the trial court's finding that the joint accounts were convenience accounts is not against the manifest weight of the evidence.

■ We next address Neitzel's claim against the estate for personal services rendered to Teall. "Where services are rendered by one person

for another which are knowingly and voluntarily accepted, the law presumes that such services were given and received in the expectation of being paid for and implies a promise to pay their reasonable worth." *In re Estate of Milborn*, 122 Ill. App. 3d 688, 690, 461 N.E.2d 1075 (1984), citing *In re Estate of Dal Paos*, 118 Ill. App. 2d 235, 254 N.E.2d 300 (1969). "[T]he lack of a specific agreement between decedent and a claimant on the amount of payment for the services or the time of payment, or a claimant's failure to make a demand for payment for the services during decedent's lifetime, does not necessarily detract from a claim." *In re Estate of Brittin*, 247 Ill. App. 3d 756, 760, 617 N.E.2d 877 (1993). Knowing and voluntary acceptance of services raises an implied promise to pay, creating a contract implied in law. *Brittin*, 247 Ill. App. 3d at 760. We presume such services to be gratuitous only if they are performed by the decedent's family members. *Milborn*, 122 Ill. App. 3d at 692. "When set in the context of a claim against a decedent's estate, the facts giving rise to a quasi-contract must be proven by clear and convincing evidence." *Milborn*, 122 Ill. App. 3d at 690-91, citing *In re Estate of Pomeroy*, 21 Ill. App. 3d 648, 316 N.E.2d 231 (1974).

■ The administrator argues that Neitzel's claim for services performed more than five years before she filed her claim are barred because her "claim for services did not involve continuing services pertaining to a single transaction or agreement. Rather, she was attempting to receive compensation for a series of gratuitous services or acts." So, the administrator concludes that the statute of limitations began to run for each independent service or act Neitzel performed, citing the five-year statute of limitations for a cause of action under an agreement not supported by a written instrument. 735 ILCS 5/13—205 (West 1998). The administrator also relies on *Brown v. Forest Park Foundation*, 17 Ill. App. 3d 718, 720, 308 N.E.2d 310 (1974), which held that the statute of limitations begins to run when the plaintiff has no contractual obligation to provide services.

Neitzel cites *Brittin* and *Floyd v. Estate of Smith*, 320 Ill. App. 171, 50 N.E.2d 254 (1943), both cases in which the claimants performed services for the decedents for more than five years before filing claims against the estates. Neitzel points out that neither court found the claim barred by the statute of limitations. But we note that it does not appear that the statute of limitations was raised in either case. The expiration of the statute of limitations is a procedural defense that can be waived if not raised. *Merritt v. Randall Painting Co.*, 314 Ill. App. 3d 556, 559, 732 N.E.2d 116 (2000).

Neitzel also relies on *Schmidt v. Desser*, 81 Ill. App. 3d 940, 942, 401 N.E.2d 1299 (1980), and *Brown*, 17 Ill. App. 3d at 720, for the

proposition that a cause of action on an oral contract for services accrues when the services are completed. But unlike *Schmidt* and *Brown*, here there was no express contract for services. Instead, the court implied a contract to compensate Neitzel for her services. We find the cases involving quasi-contract more on point.

Federal courts have applied the relevant statute of limitations to quasi-contracts in the absence of an agreement by the parties. See *United States v. Neidorf*, 522 F.2d 916 (9th Cir. 1975) (cause of action to recover distributions to shareholders that rendered corporation insolvent was founded on quasi-contract and governed by same statute of limitations as other causes of action based on contract). In *Freeman v. Freeman*, 65 Ill. 106 (1872), decedent died intestate, and his son filed a claim against the estate for services rendered to his father. There was evidence that the decedent intended to will his farm to his son, who had managed the farm for 23 years. Decedent was accidentally killed before making his will. Our supreme court found that a contract existed between the father and son, but held that the son could only recover for the five years preceding the filing of his claim. *Freeman*, 65 Ill. at 110.

In *Estate of Switzer v. Gertenbach*, 122 Ill. App. 26, 30-31 (1905), the court held that the statute of limitations does not begin to run until the death of the promisor where the parties understood that payment would be made after the promisor's death or from his estate. But the court also held:

> "[I]f the services were rendered under such circumstances that the law would imply a contract to compensate appellee, then the Statute of Limitation would apply, and would constitute a good defense as to any claim appellee might have which became due more than five years before the death of Switzer." *Switzer*, 122 Ill. App. at 31.

Here, where there was no evidence of a promise by Teall to pay Neitzel for her services, especially in light of Teall's progressing dementia, the trial court had no evidence on which to base a finding that Neitzel's cause of action for compensation accrued at Teall's death. We believe the five-year statute of limitations applies. Neitzel may only recover for services rendered during the five years preceding the filing of her claim.

■ The administrator also argues that the evidence was insufficient to support the award for services performed after Teall entered the nursing home in 1993. The administrator claims that Neitzel did not prove by clear and convincing evidence that she provided services 50 hours a week after Teall entered the nursing home in 1993.

Neitzel testified that she visited Teall in the nursing home nearly every day. She also took Teall shopping, to the beauty shop and out to

dinner. Nursing home records confirm these outings, as well as Neitzel's attendance at care plan conferences and family meetings, but do not reflect daily visits. Neitzel testified that she continued to make health care decisions in conjunction with the nursing home staff, ran errands, shopped and provided financial services to Teall while she was in the nursing home. We note that Hirn testified that all of these services, including time spent in transit, were compensable for a companion caregiver. Extra pay would be earned for being "on call," working weekends and for the expertise necessary to make financial decisions. Neitzel sought payment for 48 hours of services a week at a rate of $6 an hour.

The record does not show that Neitzel physically spent 48 hours per week visiting Teall—an average of six to seven hours a day. But Neitzel was entitled to account for her travel time, running errands, communicating with nursing home staff, and other services she performed on Teall's behalf, some of which were worth more than $6 an hour. The trial court is in a superior position to hear and weigh the evidence and determine the credibility of witnesses. *Nibco, Inc. v. Johnson*, 98 Ill. 2d 166, 173, 456 N.E.2d 120, 124 (1983), quoting *Schulenburg v. Signatrol, Inc.*, 37 Ill. 2d 352, 356, 226 N.E.2d 624 (1967). We cannot say the trial court's award for services performed while Teall was in the nursing home was against the manifest weight of the evidence.

Neitzel argues that the administrator failed to comply with the disclosure requirements of Supreme Court Rule 213 (177 Ill. 2d R. 213) when he failed to timely identify Dr. Fishman as an opinion witness. In response to Neitzel's January 3, 2000, Rule 213 interrogatories, the administrator stated that he had not yet determined whether any opinion witnesses would testify. Then in a supplemental answer on June 27, 2000, the administrator stated, "It is expected that Anne Neitzel, Eric Matlin and Dr. Fishman may offer opinions as set forth in response to [Neitzel's Rule 213(f) inquiry]." The trial began on July 24, 2000, when Neitzel moved to bar Dr. Fishman from testifying and from introducing notes, writings or documents in evidence. The trial court barred Dr. Fishman from testifying, but allowed Dr. Fishman's letter into evidence.

■ When a party objects to an opinion witness's opinion, the proponent of the witness has the burden of proving that the opinion was disclosed in the witness's discovery deposition or the proponent's Rule 213(g) interrogatory answer. *Seef v. Ingalls Memorial Hospital*, 311 Ill. App. 3d 7, 724 N.E.2d 115 (1999). "[I]f an opinion is important to the theory of one's case, it is essential that it and the bases therefor be disclosed. This is a bright line rule and must be followed." *Seef*,

311 Ill. App. 3d at 24. The trial court may bar the witness from testifying as a sanction for violating Rule 213(g). *Warrender v. Millsop*, 304 Ill. App. 3d 260, 268, 710 N.E.2d 512, 517 (1999).

■ The administrator argues that Dr. Fishman's letter was admissible under the business record exception to the hearsay rule. But the letter was introduced through the testimony of Neitzel, who could not provide a proper foundation for the letter's introduction. There was no evidence presented that Dr. Fishman made the record in the regular course of business. Neitzel was not the original maker of the record, nor was she familiar with the record sought to be admitted or the business and procedures under which it was made. We agree that Dr. Fishman's correspondence was inadmissible hearsay and should not have been admitted.

However, we do not believe that the admission of the correspondence substantially prejudiced Neitzel. In light of Neitzel's testimony that she opened the joint accounts after obtaining Teall's power of attorney and that Teall never told her she wanted Neitzel to have the money in the accounts, we believe Neitzel did not present strong evidence to overcome the presumption of fraud. The record shows that, even before Neitzel began helping Teall, Teall was unable to manage her financial affairs to pay her taxes. And Neitzel testified that she never discussed with Teall whether the accounts were to include a right of survivorship. The admission of the letter was harmless error. *Lawson v. G.D. Searle & Co.*, 64 Ill. 2d 543, 559, 356 N.E.2d 779 (1976).

We affirm the trial court's finding that the joint accounts were convenience accounts. We reverse the award for services Neitzel performed before May 15, 1993, and remand to the trial court to recalculate the award for services provided from May 15, 1993, until Teall's death.

Affirmed in part and reversed in part; cause remanded.

GORDON and COUSINS, JJ., concur.