2024 IL App (1st) 230766-U

FIRST DISTRICT,
FIRST DIVISION
August 19, 2024

No. 1-23-0766

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| In re ESTATE OF ROBERT SCHNEIDEMAN, DECEASED, | ) ) ) | Appeal from the Circuit Court of Cook County |
| Plaintiff-Appellee, | ) ) | |
| | ) | No. 2015 P 001562 |
| v. | ) ) | |
| | ) | Honorable |
| DOUGLAS HANSON, AS SUCCESSOR TRUSTEE OF THE ROBERT I. SCHNEIDEMAN TRUST DATED MARCH 7, 2000, | ) ) ) ) | Kent A. Delgado, Judge Presiding. |
| | ) | |
| Defendant-Appellant, | ) | |

JUSTICE COGHLAN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not err in finding that the decedent's revocation of a prior trust was valid, finding that his conveyance of property was a valid *inter vivos* gift, finding that the gift recipient was entitled to the proceeds from the sale of that property, and converting the award of proceeds to a money judgment for purposes of accruing interest.

¶ 2   Robert I. Schneideman was the owner of a condominium at 1500 Oak Avenue in Evanston, Illinois (Property) and died without heirs on February 24, 2013. Prior to his death, Schneideman established the Robert I. Schneideman Trust, dated March 7, 2000 (Trust), with Northwestern

University as the sole beneficiary. The Property was sold on September 3, 2014, by defendant Douglas Hanson in his capacity as Successor Trustee of the Trust and the net proceeds from the sale totaled $298,947.93.

¶ 3 On February 3, 2010, Schneideman revoked the Trust via signed written instrument. On August 3, 2010, Schneideman executed an attested Last Will and Testament in which he revoked his prior will and made Sybil Young, his live-in caretaker, the executor and sole beneficiary of his estate. On December 21, 2010, Schneideman transferred the Property to Young via quitclaim deed. On September 11, 2015, the Estate of Robert I. Schneideman (Estate) filed a petition to issue citations to discover assets, seeking to recover the Property because after it was an asset of the Estate, not the Trust.

¶ 4 On November 5, 2015, the Estate filed a complaint to recover the $298,947.93 in net proceeds. After a bench trial, the trial court denied the Estate's complaint to recover on November 9, 2022, finding that Schneideman's trust revocation was valid, that the Property had been properly conveyed to Young as a gift via quitclaim deed, and that she was entitled to the proceeds of its sale. On May 31, 2023, the court converted the net proceeds awarded to Young into a money judgment for statutory interest to accrue and ordered defendant to post an appeal bond.

¶ 5 Defendant now appeals the court's November 9, 2022, order that awarded Young the net proceeds of the sale of the Property, the court's April 4, 2023, denial of his motion for reconsideration, and the court's money judgment and appeal bond order of May 31, 2023. For the reasons that follow, we affirm the judgment of the circuit court.

¶ 6 I. BACKGROUND

¶ 7 Before his death, Robert Ivan Schneideman was a professor of theater and drama at Northwestern University. Schneideman originally owned and lived at the Property until his death on February 24, 2013.

¶ 8        On March 7, 2000, Schneideman established the Trust, which provided that if he died without a surviving spouse, child, or other specific beneficiary, Northwestern University would be the sole beneficiary of the Trust's assets. Schneideman retitled his assets, including the Property, by conveying them to the Trust. Schneideman passed away at the age of 86 without any surviving heirs.

¶ 9        Before his death, beginning in 2007, Schneideman required assistance with daily activities including driving and grocery shopping. Sybil Young was hired as a live-in caretaker to provide around-the-clock care.[1] Over time, the two grew close and Schneideman attended events with Young's family, including her daughter, Ann-Marie Martin, and expressed a desire to marry Young. After Schneideman's death, Young made the arrangements for his funeral.

¶ 10        On February 3, 2010, Schneideman revoked the Trust in a document that stated, "I, Robert I. Schneideman, revoke the Declaration of Trust in whole." At trial, Martin testified that Schneideman asked her to write the document as he dictated, and she typed his statement out on a laptop. The document was printed and Schneideman read it aloud to Young at his home before using a rubber stamp to affix his signature. The same day, Young and Schneideman mailed the revocation letter to the law firm of Schuyler Roche & Crisham P.C., who originally drafted the Trust.

¶ 11        On August 3, 2010, in the presence of Young, Martin, Steven Hansen, and Neville Muir, Schneideman signed a Last Will and Testament, revoking his previous will. Schneideman bequeathed "all the rest of my property, whether real or personal, wherever located, to Sybil Young, my friend," and appointed her the executor of his estate. Schneideman used the rubber stamp to affix his signature to the will.

---

[1] Testimony presented at the August 2022 bench trial is incorporated throughout.

¶ 12    On November 11, 2010, Schneideman executed a power of attorney, appointing Young as his agent with general power, including over Schneideman's property and finances. On December 21, 2010, Schneideman conveyed the Property to Young via quitclaim deed. Martin testified that she and Young prepared the deed by filling in the blanks on the form at Schneideman's direction while they were at Muir's insurance office. The deed was signed, witnessed, and notarized immediately thereafter. Martin testified that she filed the deed with "the court" without further explanation. Schneideman did not immediately transfer the Property from the Trust.

¶ 13    On September 3, 2014, the Property was sold and, because the record owner of the Property was the Trust, defendant conveyed the Property to the buyers through a trustee's deed. The net proceeds of the sale were $298,947.93.

¶ 14    On September 11, 2015, the Estate filed a petition to issue citations to discover assets on the ground that the Property was an asset of the Estate, not the Trust. On November 5, 2015, the Estate filed a complaint to recover assets against defendant, asserting that, because Schneideman intended to revoke the Trust prior to his death, the net proceeds from the sale of the Property "are an asset of the Estate *** and not an asset of the *** Trust."

¶ 15    Pursuant to an agreed order dated April 18, 2016, the proceeds from the sale of the Property were held in the Trust pending further order of the court.

¶ 16                                   A. Trial

¶ 17    At trial, Steven Hansen, the father of Martin's child, and Neville Muir, an insurance agent, both noted that Schneideman was "in good perfect mind and he responded well" when he signed the revocation of his will at Muir's office on August 3, 2010. When Schneideman signed the power of attorney at his office on November 11, 2010, Muir noted that he was "in good condition, healthy, aware as he's always done [sic]." Hansen opined that when Schneideman signed the quitclaim deed on December 21, 2010, he "very much" intended to convey the Property to Young.

Schneideman told Hansen that "he is really lucky to have [Young]."

¶ 18    Anne-Marie Martin was a part-time caregiver for Schneideman from 2011 until he passed away while her mother, Sybil Young, lived with Schneideman to provide full-time care. Martin believed that Schneideman "most definitely" considered them family and wished Young to have the Property. Schneideman expressed his love for Young and occasionally discussed the idea of marrying her with Martin.

¶ 19    Sybil Young was born in Jamaica and came to America in 1979. Young was hired as Schneideman's caregiver after he did not get along with two previous caregivers. During the time Young worked for Schneideman between 2007 and 2013, no one from Northwestern visited Schneideman. At one point, Schneideman told her, "I'm not giving any more to Northwestern anymore." At the time Schneideman revoked the Trust, Young owned her own home in Evanston. Schneideman first told Young that he wanted to marry her after "about a year," but Young declined. Young and Schneideman would occasionally handle his financial affairs "together." After Schneideman died, Young remodeled the Property and tried to sell it but was unsuccessful because an attorney told her "it is in the Trust."

¶ 20    Dr. Howard Vernof testified on defendant's behalf that Schneideman had been his patient since the early 2000s. Dr. Vernof diagnosed Schneideman with dementia sometime between 2007 and 2011. Schneideman required Young as a caregiver "in his last few years" as his dementia "progressed." Dr. Vernof's notes from July 2011, October 2011, and January 2013, reflected that Schneideman was alert, oriented, and able to understand what he was saying.

¶ 21    After the conclusion of trial, the court denied the Estate's complaint to recover, finding that the Property belonged to Young on the date of the sale, and therefore she was specifically entitled to the $298,947.93 in proceeds. In doing so, the court found that there was a valid revocation of the Trust and a valid transfer of the Property via quitclaim deed. Regarding the Trust revocation,

the court stated: "I do find the witnesses are credible with regard to the event happening on February 3rd of 2010. *** There's no contradictory evidence. There's no one from *** the law firm that is rebutting the fact that it was mailed, that they received it or didn't receive it." The court found that Schneideman "did what was required to revoke the trust" and that "the decision was [Schneideman]'s to revoke" and "was not a result of undue influence." The court explicitly rejected defendant's argument that Schneideman lacked the capacity to revoke the trust. The court noted, "The fact that the property was not removed from the trust is of no consequence as far as this court is concerned. The issue is his intent and did he follow through on the revocation process dictated by the trust, and he did."

¶ 22    Turning to the transfer of the Property via quitclaim deed, the court found "it's essentially a gift. It's an *inter vivos* gift." However, the court noted, "there's an enhanced burden on behalf of Sybil Young, because at this point, there's no question that she is a fiduciary at law. She was a power of attorney." The court found that the presumption of fraud was overcome and that the transfer was "not the result of undue influence" but "it was fair and equitable *** it's based on his love and affection for her." Finally, the court found that the Property was not an estate asset because:

> "[T]he trust revocation was valid. And when it was revoked, the subject of this hearing is that property which has been sold and is now the money we're talking about. That became his property. And if he had done nothing further when he passed, it would be an asset of the estate. But I find that the quitclaim deed was valid and that quitclaim deed now gave the property to Sybil Young"

and therefore Young was entitled to the proceeds of its sale.

¶ 23                                B. Post-Trial

¶ 24    On December 8, 2022, defendant filed a motion for reconsideration and to vacate judgment,

arguing that the trust revocation was insufficient because Schneideman did not convey the Property out of the trust and the transfer of the Property via quitclaim deed was insufficient.

¶ 25 On April 4, 2023, the trial court denied defendant's motion for reconsideration and ordered defendant to turn over the $298,947.93 that was being held in the Trust to Young. On May 31, 2023, the trial court reduced the April 4, 2023, order to a judgment "for purposes of interest on the cash deposit" and instructed defendant to "post an additional cash deposit or bond at 9% interest for 18 months for a total of $40,357.97."

¶ 26                                    II. ANALYSIS

¶ 27 On appeal, defendant argues that: (1) the trial court did not have jurisdiction to award Young the proceeds of the sale of the Property, (2) the court erred in finding that the Property was a valid gift from Schneideman to Young, (3) the court erred in finding that Schneideman properly revoked the Trust, (4) Young and Martin partook in the unauthorized practice of law, and (5) the trial court erred in reducing the order of April 4, 2023, to a money judgment to accrue interest.

¶ 28 Initially, we consider defendant's motion to strike plaintiff's response brief, which was taken with the case. Defendant argues that, because the trial court found that the proceeds of the Property's sale belonged to Sybil Young, "[t]he Estate is not a party to the trial orders [defendant] appeals." Defendant asserts that because Young "did not file an appearance nor a response brief" to the appeal, the appeal "should be deemed uncontested and the relief he seeks be granted." We disagree. The Estate, as plaintiff, is the proper party to respond to defendant's appeal because its complaint set the proceedings in motion and plaintiff appeared and argued its case at trial. In his Last Will and Testament, Schneideman made Young the executor and sole beneficiary of the Estate, so the interests of Young and plaintiff are in sync on this matter.

¶ 29 We also reject defendant's claim that plaintiff "change[d] course" by arguing on appeal that the proceeds belong to Young. In its complaint, plaintiff maintained that the proceeds did not

belong to the Trust because Schneidman had properly revoked the Trust. Instead, plaintiff argued, the proceeds belonged to the Estate and, as the executor of the Estate and its sole beneficiary, Young was entitled to the proceeds. Plaintiff retains the same position on appeal and we decline to strike plaintiff's response brief.

¶ 30                                    A. Jurisdiction

¶ 31        Defendant argues that the trial court lacked jurisdiction to award the proceeds to Young because she failed to file a petition "seeking the turnover of the funds to her personally," as required under 755 ILCS 5/16-1.

¶ 32        Section 16-1(a) confers standing to bring a citation petition on the representative of the estate or "any other person interested in the estate." See 755 ILCS 5/16-1 (West 2020); see also 755 ILCS 5/1-2.11 (West 2020) (The Probate Act of 1975 defines an "interested person" in relation to any action under the Act to include an heir and one who has a financial interest or property right that may be affected by the action). Proceedings under section 16-1 are " 'intended to provide comprehensive and summary means for the discovery and recovery of assets, or of their value if they have been converted.' " *Matter of Denler's Estate*, 80 Ill. App. 3d 1080, 1091-92 (1980) (quoting *Keshner v. Keshner*, 376 Ill. 354, 359 (1941)). In such a proceeding, the court is "empowered to determine the title and right of property and enter such orders as the case requires." *In re Estate of Elias*, 408 Ill. App. 3d 301, 314 (2011). The proceedings "may develop into an out and out suit for the recovery of money." *Keshner*, 376 Ill. at 359-60.

¶ 33        It is undisputed that in this case, the citation petition to initiate proceedings under Section 16-1 was brought by the Estate. In the petition, the Estate asserted ownership over the Property, and asserted its intent to recover the Property. After it was revealed that Defendant had sold the Property, the Estate filed a Complaint to Recover Assets, alleging that the proceeds were now part of the Estate.

¶ 34    Nothing requires the ultimate recipient of the trial court's order to initiate the proceeding. In exercising its power to "determine the title and right of property and enter such orders as the case requires," the court determined that the Trust was properly revoked and, therefore, the Property was no longer part of the Trust. See 755 ILCS 5/16-1(d) (West 2020). The court acknowledged that if Schneideman "had done nothing further [before] he passed, it would be an asset of the estate." However, because the trial court also found that the quitclaim deed conveying the Property to Young was valid, it found that the proceeds of its sale belonged to Young. Because the proceedings were properly brought by the Estate, the trial court had jurisdiction to adjudicate the property rights at issue and the authority to award the proceeds to Young.

¶ 35                              B. Gift via Quitclaim Deed

¶ 36    Defendant claims that the trial court erred in holding that Schneideman validly transferred ownership of the Property to Young via an *inter vivos* gift. Specifically, defendant argues that the trial court failed to properly scrutinize "a profitable transaction arising out of a fiduciary relationship that benefitted a caregiver." In response, plaintiff maintains that presumption of fraud was overcome and the gift was valid.

¶ 37    When a fiduciary relationship exists between two parties, "any transaction between parties in which the agent profits is typically presumed to be fraudulent and the agent has the burden of proving by clear and convincing evidence that the transaction was fair and equitable and did not result from the agent's undue influence over the principal." *In re Estate of Miller*, 334 Ill. App. 3d 692, 698 (2002). Undue influence is defined as " 'any improper *** urgency of persuasion whereby the will of a person is overpowered and he is induced to do or forbear an act which he would not do or would do if left to act freely.' " *Franciscan Sisters Health Care Corp. v. Dean*, 95 Ill. 2d 452, 460 (1983) (quoting *Powell v. Bechtel*, 340 Ill. 330, 338 (1930)).

¶ 38    The amount of evidence necessary to rebut the presumption is not determined by a fixed rule and depends on the circumstances of each case. *Franciscan Sisters*, 95 Ill. 2d at 463. "Some of the significant factors to be considered in determining if the presumption of fraud has been rebutted include whether the fiduciary made a frank disclosure to the principal of the information he had, whether the fiduciary paid adequate consideration, and whether the principal had competent and independent advice." *Spring Valley Nursing Center, L.P. v. Allen*, 2012 IL App (3d) 110915, ¶ 13.

¶ 39    In instances of gifts between parties, the presumption of fraud may be rebutted by clear and convincing evidence that the dominant party "exercised good faith and did not betray the confidence placed in her." *In re Guardianship of Spinnie*, 2016 IL App (5th) 150564, ¶ 27. However, proof of the "existence of an affectionate relationship" between the parties alone is not enough to meet the burden of rebutting the presumption of fraud or undue influence. *Elias*, 408 Ill. App. 3d at 321.

¶ 40    We review the trial court's finding that the evidence was sufficient to overcome the presumption of fraud under the manifest weight of the evidence standard. See *Klaskin v. Klepak*, 126 Ill.2d 376, 389 (1989). "A trial court's determination as to whether a presumption of fraud has been overcome, made after an evidentiary hearing, is entitled to deference and will not be reversed on appeal unless it is against the manifest weight of the evidence." *Spring Valley Nursing Center*, 2012 IL App (3d) 110915, ¶ 14. In other words, "the complaining party must establish clear, plain, and undisputed error in the factual findings." *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 938 (2000).

¶ 41    As a matter of law, a fiduciary relationship between Schneideman and Young was established when Young obtained the power of attorney on November 11, 2010. See *Miller*, 334 Ill. App. 3d at 701 (no presumption of fraud regarding transfers prior to obtaining power of

attorney). Because Young was Schneideman's fiduciary and benefitted from the deed signed on December 21, 2010, a presumption of fraud arose. See *Miller*, 334 Ill. App. 3d at 697.

¶ 42    This presumption was rebutted by evidence at trial that Young had been Schneideman's live-in caregiver since 2007, after Schneideman dispensed with two previous caregivers. Schneideman told Hansen and Martin that he wanted to marry Young. After "about a year" of employing Young, Schneideman's first proposed to Young. Initially, she told him she would think about it, but declined his later proposals. Schneideman, whose parents and wife predeceased him, did not have any surviving relatives or other heirs, and came to see Young and her family as his own, frequently celebrating holidays, birthdays, and personal accomplishments with them. Furthermore, Schneideman repeatedly expressed his frustration with Northwestern requesting donations but not visiting him and told Young, "I'm not giving any more to Northwestern." Additionally, at the time Schneideman revoked the Trust, Young already owned her own home in the same city.

¶ 43    The evidence reflected that the gift was not a product of fraud or undue influence but part of Schneideman's personal reconsideration of his donation to Northwestern and deliberate plan to disburse his estate. All of the trial testimony indicated that Young "exercised good faith and did not betray the confidence placed in her" by Schneideman. See *Spinnie*, 2016 IL App (5th) 150564, ¶ 27. Young administered the care to Schneideman she was hired to provide and, in return, Schneideman developed romantic and platonic affection for her. While Young had opportunity to take advantage of Schneideman's feelings and accept his marriage proposals, she repeatedly declined and instead told him, "I will always be here for you and do whatever you want me to do in your house."

¶ 44    Defendant's reliance on *In re Estate of Elias*, 408 Ill. App. 3d 301 (2011) and *In re Estate of Teall*, 329 Ill. App. 3d 83 (2002) is misplaced where the evidence offered to rebut the

presumption of fraud in those cases differs significantly. In *Elias*, the decedent signed a transfer-on-death form that was proposed and drafted by her daughter, Eleanor McDonnell, acting under power of attorney, naming McDonnel the sole beneficiary of Elias's brokerage account. *Elias*, 408 Ill. App. 3d at 310. On appeal, this court found that the presumption of fraud was not overcome because "McDonnell clearly engaged in a pattern of increasingly isolating Elias from all other family members *** moved Elias away from Ohio to Illinois, took over all aspects of Elias' finances and health care, and abused her fiduciary duty under the general power of attorney in effecting the LPL transfer-on-death disposition and taking Elias' personal property." *Id.* at 320. Furthermore, McDonnell was the one to initiate the transfer-on-death form. *Id.* at 320-21. In contrast, there was no evidence in this case whatsoever that Young isolated Schneideman from anyone or abused her fiduciary duty under the general power of attorney, and the revocation and deed transferring the Property were proposed by Schneideman.

¶ 45        In *Teall*, a neighbor began to take care of the decedent after the decedent had an accident and fell at home. *Teall*, 329 Ill. App. 3d at 85. While caring for the decedent, the neighbor obtained a power of attorney, established a joint tenancy in several of the decedent's accounts and used them to pay the decedent's bills. *Id*. The account passed to the neighbor upon decedent's death. *Id*. However, the neighbor never contributed her own money to the account and admitted that she never discussed with the decedent whether the decedent intended the neighbor to keep the money in the accounts after the decedent died. *Id*. In this case, the evidence reflects that Schneideman proposed every transaction at issue and Young did not take any action regarding the property without direction from Schneideman. Accordingly, we find *Teall* and *Elias* inapposite.

¶ 46        The trial court's determination that the presumption of fraud was rebutted by sufficient evidence at trial is not against the manifest weight of the evidence.

¶ 47                                    C. Revocation of the Trust

¶ 48     Defendant also argues that plaintiff failed to prove that Schneideman properly revoked the Trust because it did not offer evidence that "at any time after February 3, 2010, Schneideman, as the trustee, conveyed the Property out of the Trust."

¶ 49     For a private trust to be revocable, the settlor of the trust must expressly reserve the right of revocation. *A.B.A.T.E. of Illinois, Inc. v. Quinn*, 2011 IL 110611, ¶ 30. Such a trust may be revoked "at the pleasure of the settlor," and the settlor can change the ownership or use of the property in the trust. *Shakman v. Department of Revenue*, 2019 IL App (1st) 182197, ¶ 27. A trust, revocable by its terms, may be revoked "by a definite statement of the settlor's intent to revoke." *Wheaton National Bank v. Aarvold*, 38 Ill. App. 3d 658, 662 (1976). However, a trust is not revoked "by any *** act which is consistent with its continued existence." *Id.*

¶ 50     In this case, Article VII, Section 5 of the Trust dated March 7, 2000, provides as follows:

"Right to Revoke: I may at any time or times during my lifetime by instrument in writing delivered to the then acting trustee amend or revoke this declaration in whole or in part. The trust property to which any revocation relates shall be conveyed to me or otherwise as I direct. This power is personal to me and may not be exercised by my legal representative, attorney-in-fact or others."

¶ 51     Schneideman was the trustee of the Trust on the date of the revocation, February 3, 2010. The revocation letter written on that date stated, in full: "I, Robert I. Schneideman, revoke the Declaration of Trust in whole." Schneideman signed the letter with a rubber stamp, which, as Young and Martin testified, he would occasionally use to sign documents. The same day, Young and Schneideman mailed the revocation letter to the law firm of Schuyler Roche & Crisham P.C., who originally drafted the Trust.

¶ 52     There was no evidence that Schneideman took any "act which is consistent with [the] continued existence" of the Trust. *Wheaton National Bank*, 38 Ill. App. 3d at 662. Instead,

Schneideman attempted to convey the Property to Young via quitclaim deed later that year. Furthermore, Schneideman's actions *before* completing the revocation letter also reflected his intent to revoke the trust. For example, he told Young, "I'm not giving any more to Northwestern anymore." Accordingly, we agree with the trial court that Schneideman's February 3, 2010, letter was sufficient to revoke the Trust.

¶ 53 While the mere revocation of the Trust in this case, without more, does not create a rebuttable presumption of fraud, the trial court found that Schneideman "revoked the trust *** because he wanted [Young] to have the property," and therefore the presumption of fraud related to the quitclaim deed also applied to the revocation. For the same reasons, we find that the presumption of fraud was overcome with regard to the quitclaim deed, and that any presumption of fraud related to the revocation of the trust was also overcome. See *Supra* ¶¶ 42-43.

¶ 54                                    D. Unauthorized Practice of Law

¶ 55 Defendant also claims that Young and Anne-Marie Martin and engaged in the unauthorized practice of law "by preparing the Deed and Revocation Statement for Schneideman to sign." In response, plaintiff maintains that they merely "acted as a scrivener under the direction and supervision of Schneideman."

¶ 56 In Illinois, "[t]he power to regulate and define the practice of law is a prerogative of [our supreme court] under the Illinois Constitution." *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 12 (2005). This regulatory power has been codified in the Attorney Act. See 705 ILCS 205/1 (West 2020) ("No person shall receive any compensation directly or indirectly for any legal services other than a regularly licensed attorney, nor may an unlicensed person advertise or hold himself or herself out to provide legal services."). The court closely regulates the practice of law in order to "protect the public from potential injury resulting from laypersons performing

acts that require the training, knowledge, and responsibility of a licensed attorney." *King*, 215 Ill. 2d at 12.

¶ 57    Pursuant to the *pro se* exception, a layperson who does not have the requisite legal training or law license may appear in court on his or her own behalf. 705 ILCS 205/11 (West 2020) ("Plaintiffs shall have the liberty of prosecuting, and defendants of defending in their proper persons."). The exception applies "to the preparation of documents in situations where the party preparing the legal documents does so for his or her *own benefit* in a transaction *to which the preparer is a party*." (Emphases added.) *King*, 215 Ill. 2d at 14. Although the right of self-representation authorizes a person to appear on his or her own behalf, this privilege does not extend to representing others "unless he is admitted to the practice of law." *Janiczek v. Dover Management Co.*, 134 Ill. App. 3d 543, 545 (1985). However, our supreme court has noted that "if the advice given or the service performed requires legal skill or knowledge, or more than ordinary business intelligence, it constitutes the practice of law." *People ex rel. Illinois State Bar Ass'n v. Schafer*, 404 Ill. 45, 53 (1949).

¶ 58    In this case, neither Martin nor Young engaged in the unauthorized practice of law. There is no evidence that Young was involved in the drafting of the revocation document at all. Instead, Martin admitted that she typed up the revocation letter at the direction of Schneideman. While Martin acknowledged that she and Young helped to fill out the pre-printed quitclaim deed, this was also done at the direction and under the supervision of Schneideman on his own behalf. Neither Young nor Martin attempted to represent Schneideman in any legal proceedings. Instead, they merely acted as recorders, transcribing Schneideman's words under his supervision and direction. Schneideman was present during the drafting of the revocation document and quitclaim deed and read the documents aloud to ensure their accuracy before affixing his signature via rubber stamp. Martin and Young did nothing that required "legal skill or knowledge, or more than

ordinary business intelligence," and therefore did not constitute the practice of law. *Schafer*, 404 Ill. at 53.

¶ 59                                              E. Money Judgment

¶ 60            Finally, defendant contends that the trial court erred when it reduced the April 4, 2023, turnover order into a money judgment so as to enable statutory interest to accrue.

¶ 61            "The decision to allow statutory interest lies within the sound discretion of the circuit court and will not be disturbed absent an abuse of that discretion." *Niemeyer v. Wendy's Intern., Inc.*, 336 Ill. App. 3d 112, 115 (2002). The imposition of statutory interest is not a penalty but meant to "preserve[] the value of the liquidated obligation by compensating the judgment creditor for delays in payment." *Illinois State Toll Highway Authority v. Heritage Standard Bank & Trust Co.*, 157 Ill. 2d 282, 295 (1993); see also *Pinkstaff v. Pennsylvania R. Co.*, 31 Ill. 2d 518, 525 (1964) (the policy is to make plaintiff whole by allowing interest to accrue on judgment pending appeal regardless of which party appeals). In other words, "interest is neither a penalty nor a bonus, but instead a preservation of the economic value of an award from diminution caused by delay." *Illinois State Toll Highway Authority*, 157 Ill. 2d at 299. An award of interest "requires that the amount owed be certain," (*Department of Transportation v. GreatBanc*, 2020 IL App (1st) 171393, ¶ 64) and pursuant to 735 ILCS 5/2-1303(a) (West 2022), "judgments recovered in any court shall draw interest at the rate of 9% per annum from the date of the judgment until satisfied."

¶ 62            During the pendency of an appeal, a party may obtain a stay of enforcement of a money judgment by filing a "timely notice of appeal" and posting an "appeal bond or other form of security." Ill. S. Ct. R. 305(a) (eff. July 1, 2017). This bond "ordinarily shall be in an amount sufficient to cover the amount of the judgment and costs plus interest reasonably anticipated to accrue during the pendency of the appeal." *Id.*

¶ 63        In this case, defendant held the $298,947.93 of net proceeds in the Trust pursuant to the trial court's April 18, 2016, order. At the conclusion of trial, the court found that Young was entitled to the full amount of net proceeds. On April 4, 2023, the trial court ordered defendant to turn over the net proceeds to Young "on or before March 31, 2023." On April 11, 2023, plaintiff filed a petition for rule to show cause, noting that defendant had not turned over the proceeds as of April 7, 2023. Defendant then filed a "Motion for Stay of Enforcement and Approval of Cash Deposit as Security" on April 28, 2023, requesting that the court allow it to deposit the $298,947.93 with the Clerk of Court "as and for security for this appeal." In response, plaintiff asserted that defendant should be required to post the net proceeds along with two years' interest because otherwise "defendant is using Sybil Young's money as bond," which would be "inequitable." Ultimately, on May 31, 2023, the trial court ordered that "the April 4, 2023[,] Order is reduced to judgment for purposes of interest on the cash deposit" and "[d]efendant must post an additional cash deposit or bond at 9% interest for 18 months for a total of $40,357.97."

¶ 64        Relying solely on *In re Marriage of Poulsom*, 2022 IL App (1st) 220100, defendant incorrectly argues that "[t]here is no money judgment entered against Hanson and in favor of Young upon which judgment interest may accrue." After trial, the court ordered that the $298,947.93 in proceeds, which had been held in the Trust pursuant to court order since April 18, 2016, belonged to Young. The court's May 31, 2023, order very clearly converted this award to a money judgment for the purpose of accruing statutory interest to ensure the preservation of the monetary value of the net proceeds during defendant's appeal.

¶ 65        Furthermore, in *Poulsom*, the reviewing court determined that for purposes of the 20-year statute of limitations, a provision of the judgment for dissolution of marriage regarding the sale of the marital residence was an "injunction, and not a money judgment, because it required [the husband] to perform several positive acts to sell the residence, which necessarily must occur before

the parties could determine the amount owed." *In re Poulsom*, 2020 IL App (1st) 220100, ¶ 23. In this case, the Property was already sold by the time the court entered the judgment, and thus defendant was not ordered to "perform several positive acts" in order to comply with the court's order. Instead, he needed only to turn over the net proceeds of the sale of the Property, which he failed to do in the original time allotted.

¶ 66        The trial court did not abuse its discretion in converting the award to a money judgment or ordering defendant to post an appeal bond.

¶ 67                              III. CONCLUSION

¶ 68        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 69        Affirmed.